**In re CITY OF PHILADELPHIA LITIGATION.**

**Ramona AFRICA**

v.

**CITY OF PHILADELPHIA, et al.**

Civ. A. No. 87–2678.

United States District Court, E.D. Pennsylvania.

Jan. 25, 1994.

Thomas R. Kline, Alvin F. de Levie, Donald M. Temple (co-counsel), Philadelphia, PA, for plaintiffs.

Carl Oxholm III, Deputy City Sol., Philadelphia, PA, for Frank Powell, Fire Commissioner Wm. B. Richmond, W. Wilson Goode, Leo A. Brooks, Gregore Sambor, and the City of Philadelphia et al.

Gerard Lavery Leverer, Philadelphia, PA, for Louise James (third party deft.).

Michael A. Fenasci, New Orleans, LA, for Zelma Dotson Harrigan.

Michael A. Fenasci, A. Remy Fransen, Jr., New Orleans, LA, for Claire Leak and Louise James.

Anthony D. Jackson, Philadelphia, PA, for Thomas Mapp, Sr., et al.

Carl Oxholm, III, Divisional Deputy City Sol., Philadelphia, PA, for Edward Rendell.

Laura Fredricks, John O.J. Shellenberger, Office of Atty. Gen., Philadelphia, PA, for Richard L. Reed and Morris Demsko.

Bruce M. Rotfeld, Rotfeld & Rotfeld, Philadelphia, PA, for Nathaniel Galloway.

Theodore G. Otto, III, Chief Counsel, Camp Hill, PA, for Department of Corrections.

Seymour Kurland, Wolf, Block, Schorr & Solis–Cohen, Philadelphia, PA, for Ramona Johnson Africa.

Joseph Torregrossa, Morgan, Lewis & Bockius, Philadelphia, PA, for Alfonso Robbins Africa.

Carl Oxholm, Philadelphia, PA, for Albert Revel, Frank Powell, Michael Tursi and William Klein.

Michael A. Fenasci, Gretna, LA, Thomas A. Sprague, Peter L. Gallagher, Philadelphia, PA, for Claire Leak.

Peter C. Kennedy, Hecker, Brown, Sherry & Johnson, Philadelphia, PA, for William Richmond.

E. Jane Hix, Chief Asst. City Sol., Philadelphia, PA, for City of Philadelphia, Willie Goode, Leo A. Brooks, George Sambor, William Richmond and Richard Reed.

Lloyd George Parry, Davis, Riter, Parry & Hartmann, Philadelphia, PA, for Michael Tursi.

Leslie M. Gerstein, Fox, Rothschild, O'Brien & Frankel, Philadelphia, PA, for Leo A. Brooks.

Fincourt B. Shelton, Philadelphia, PA, for Louise James.

Robert J. Marano, Law Offices of Edward J. Wilbraham, Philadelphia, PA, for Albert Revel.

## OPINION *

LOUIS H. POLLAK, District Judge.

What we have for consideration today are three cases growing out of the tragic events of May 13, 1985 in which, unhappily, as too many people in this city will recall, in an effort to arrest certain members of the MOVE organization, an explosive device was dropped on the MOVE residence at 6221 Osage Avenue. A fire ensued, and of the thirteen persons inside the MOVE dwelling on that late spring afternoon, only two, one child and one adult, survived. In addition to the destruction of that residence and eleven of the thirteen people within, there was a conflagration which consumed in substantial measure large numbers of adjacent homes.

Much litigation has ensued. The bulk of it was consolidated in this court under the master caption Number 85–2745. That was a repository for the papers and numerous lawsuits, some of them brought by or on behalf of those at 6221 Osage Avenue, the bulk of them brought by or on behalf of adjacent property owners, against a large array of official defendants charged in one manner or another with violating federal and state legal norms. The large bulk of these cases have been settled. The three which are to be addressed today have not been settled.

They all grow directly out of the events at 6221 Osage Avenue. The three cases in the order of their filing are *Louise James v. The City of Philadelphia, et al.,* Civil Action No. 85–3528, *Ramona Africa v. The City of Philadelphia, et al.,* Civil Action No. 87–2678, and *Alfonso Leaphart v. The City of Philadelphia, et al.,* Civil Action No. 87–2756.

In the *James* case, the plaintiff Louise James is suing on behalf of her son Frank James, also known as Frank Africa, who perished in the conflagration at 6221 Osage, and she is also suing in her capacity as owner of 6221 Osage. Alfonso Leaphart sues on behalf of another person who died in the blaze, Vincent Leaphart, also known as John Africa. Ramona Africa, who is present here in this courtroom, is the one adult who survived the blaze. She sues the City of Philadelphia and many individual defendants. We will first consider Ms. Africa's case.

We consider her case, as we will in due course consider the cases of Ms. James and Mr. Leaphart, on the basis of the report and recommendation filed by my very distinguished former colleague Magistrate Judge William F. Hall, Jr. in October of 1993. I say, with regret, "former colleague" because as of December 31, 1993, Judge Hall's remarkable tenure as one of the important figures in the administration of justice in this district came to an end as he retired from office. Judge Hall has for many years contributed greatly to the vindication of the highest principles of the law, and his management of this extraordinary litigation, which has been consolidated under his supervision for these past many years, has been exemplary—but exemplary in the style of a judge who knows only excellence.

Ramona Africa's case, like its companion cases, precipitated years of discovery, of pretrial inquiry into the facts surrounding the events of May 13, 1985. After this extended period of discovery, the many defendants moved for summary judgment with respect to the several claims Ms. Africa presented. Her several claims may be briefly summarized as follows. There were three sets of

---

* This is a transcript—slightly edited for clarity—of a bench opinion delivered by Judge Pollak on

January 3, 1994.

federal claims, the first under Section 1983 of Title 42 in effect alleging that the assault on 6221 Osage violated her constitutional rights. Second, Ms. Africa alleged not only that she was physically assaulted by the bombing and the ensuing fire but that her First and Fourteenth Amendment rights to freedom of speech and freedom of religion were tresspassed upon by the defendants. And the third of her federal claims was an allegation, pursuant to 42 U.S.C. § 1985(3), of a conspiracy among the defendants to deprive her of her entitlement to equal treatment under the laws. In addition, Ms. Africa alleged claims arising under Pennsylvania law, claims which essentially mirror her claims of assault, of grossly disproportionate use of force against her in violation of Section 1983, the first and principal of the federal claims.

Those sued by Ms. Africa, in addition to the City of Philadelphia, numbered among them former Mayor Wilson Goode, former Managing Director Leo Brooks, former Police Commissioner Gregore Sambor, former Fire Commissioner William Richmond, former District Attorney Edward Rendell, Police Lieutenant Frank Powell, Officers William Klein, Michael Tursi, and Sergeants Albert Revel and Edward Connor of the Philadelphia Police Force, and finally Corporal Morris Demsko and State Trooper Richard Reed of the Pennsylvania State Police.

■ The principal, though to be sure not the only, issues tendered by the motions for summary judgment were claims that the various defendants were protected from suit by doctrines of qualified immunity. In general, the doctrine of immunity provides that officials should be insulated from suits for torts arising out of their official activity and with which they are charged, provided that the allegedly tortious conduct is conduct which they could have reasonably supposed to have been lawful at the time committed. The purpose of doctrines of immunity, both absolute—and in one instance, one of the defendants asserted absolute immunity—and qualified immunity, the purpose of these doctrines is to make sure that public officials are able to carry out their duties without looking over their shoulder at every moment in fear that litigation may ensue from one or another

action taken, purposefully and forcefully, to carry out their duties.

On March 3, 1992, Judge Hall issued a report and recommendation concluding that former District Attorney Rendell, who was charged by Ms. Africa with having authorized search and arrest warrants of MOVE members without probable cause, was immune from suit on that complaint. It was Judge Hall's view that making such a decision as to the appropriateness of the warrants was exactly within the scope of District Attorney Rendell's official functions and that he was cloaked with immunity in making such decisions. On December 8, 1992, I sustained Judge Hall's report and recommendation with respect to former District Attorney Rendell and entered an order dismissing him from this lawsuit, granting summary judgment in his favor. I did not adopt exactly the same rationale as that propounded by Judge Hall. I concluded that Mr. Rendell was entitled to qualified, not absolute, immunity in a context in which, so it seemed to me, he did have probable cause to issue the warrants in question.

On March 26, 1992, Judge Hall filed a report and recommendation which dealt with the claims of immunity of all of the other individual defendants and also the claim of the City of Philadelphia that it was exempt from suit. Judge Hall concluded that no immunity was owing to any of the defendants, with the exception of Officer Tursi and Sergeants Revel and Connor. Judge Hall reasoned that the responsibilities of those officers had to do with an attempt, which was abandoned, to drill holes into the walls adjacent to 6221 Osage with a view to injecting tear gas into 6221 in that fashion. When that tactic was unavailing, the decisions were taken at higher levels to proceed in the alternate fashion leading to the dropping of an explosive device to which I have referred. But since Officer Tursi and Sergeants Revel and Connor were not involved in those further decisions, Judge Hall concluded that they should be dropped from the case, and I approved their dismissal on August 18, 1992. However, Judge Hall concluded as to the other defendants who were implicated, except for Fire Commissioner Richmond, in the

development and execution of the plan to drop a bomb on 6221 Osage, that that was a decision that could not have reasonably been thought to be an appropriate law enforcement measure.

Just over a year ago, on December 8, 1992, 809 F.Supp. 375, I remanded this case to Judge Hall to reconsider it. I concluded that it was necessary to examine the case in the light of federal constitutional law as it stood on May 13, 1985, the day that the events sued on took place. In that connection, I pointed out that the United States Supreme Court, in the case of *Tennessee v. Garner*, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1, which was decided in March of 1985, just two months before the events at 6221 Osage, had formulated a rule of constitutional law construing the requirements of the Fourth Amendment as they applied to situations in which law enforcement officers were undertaking to deal with the flight of persons suspected of serious felonious conduct. The Supreme Court in *Tennessee v. Garner* had formulated a rule which for Pennsylvania peace officers could properly be regarded as effectively adopting the then prevailing provisions of Section 508 of the Pennsylvania Criminal Code.

What the Supreme Court said in *Tennessee v. Garner* was the following:

The use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable. It is not better that all felony suspects die than that they escape. Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so. It is no doubt unfortunate when a suspect who is in sight escapes, but the fact that the police arrive a little late or are a little slower afoot does not always justify killing the suspect. A police officer may not seize an unarmed, nondangerous suspect by shooting him dead. The Tennessee statute is unconstitutional insofar as it authorizes the use of deadly force against such fleeing suspects.

It is not, however, unconstitutional on its face. Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force. Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given.

471 U.S. at 11–12, 105 S.Ct. at 1701.

I refer to Section 508 of the Pennsylvania Criminal Code. I do so because the Supreme Court in a footnote to its opinion in *Tennessee v. Garner*—an opinion by Justice White, recently retired—cited a number of state statutes embodying in a variety of verbal forms a rule approximating that adopted by the Supreme Court itself in *Tennessee v. Garner*. The Pennsylvania legislature had provided in Section 508 with respect to a peace officer's use of force in making an arrest—and here I quote only in relevant part:

(1) A peace officer, or any person whom he has summoned or directed to assist him, need not retreat or desist from efforts to make a lawful arrest because of resistance or threatened resistance to the arrest. He is justified in the use of any force which he believes to be necessary to effect the arrest and of any force he believes to be necessary to defend himself or another from bodily harm while making the arrest. However, he is justified in using deadly force only when he believes that such force is necessary to prevent death or serious bodily injury to himself or such other person, or when he believes both that:

(1) such force is necessary to prevent the arrest from being defeated by resistance or escape; and

(ii) the person to be arrested has committed or attempted a forcible felony or is attempting to escape and possesses a deadly weapon, or otherwise indicates that he will endanger human life or inflict seri-

ous bodily injury unless arrested without delay.

18 Pa.C.S. § 508.

In remanding this case to Judge Hall in the light of the principles I have referred to, I said, "Therefore, the Court must determine on *plaintiff's* well-documented version of the facts whether a reasonable officer in each defendant's position, to the extent that this defendant could be found to have some responsibility for the use of force in question, could have believed that the force employed was necessary to protect the safety of himself or others." And I referred to a Third Circuit case [*Good v. Dauphin County Social Services,* 891 F.2d 1087, 1092, 1094–95 (3d Cir.1989) ]. I went on, "If the answer to that question with respect to any of the defendants is in the affirmative, then summary judgment should be granted in his favor; by contrast, for those defendants to whom the answer is in the negative, summary judgment on qualified immunity grounds should be denied (though it may be raised anew once facts are further developed and explored at trial)."

Against that background, Judge Hall considered the case anew, and on October 6, 1993, he issued a new report and recommendation. In his new report, Judge Hall concluded that the dropping of the bomb could, notwithstanding the events that ensued, have been thought, at the time of the decision to drop the bomb, to have been a reasonable device for accomplishing the purposes which the police officers were responsible for accomplishing. "I conclude," said Judge Hall, "that a reasonable person in each of the defendant's positions could have believed that the use of an explosive device to remove the bunker from the roof and to provide access to the interior of the house for tear gas was necessary to 'prevent death or serious bodily injury' to the police officers on the scene or other persons. In addition, based on the information available to them regarding MOVE's threats of violence and MOVE's use of force in resisting arrest, they could have believed that the use of the bomb would be conduct that was consistent with the principles embodied in Section 508 and *Garner.*"

In that connection, Judge Hall had before him a great deal of testimony about the course of planning which led to the decision to drop a bomb. There was, as I have indicated, an initial plan to attempt to gain access to 6221 Osage Avenue by breaching the walls and thereby introducing tear gas with a view to bringing those in the house outside. That plan turned out not to be feasible, and then there was developed the plan which Police Commissioner Sambor adopted—and got the agreement of Managing Director Brooks, who in turn got the agreement of the Mayor—to try the dropping of an explosive device with a view to (1) removing a bunker that had been built on the top of the house and which the fire department had been unsuccessful in removing by squirting very forceful streams of water on it during the day, and also (2) making a hole in the roof through which tear gas could be introduced. It was in that context that Judge Hall reached the legal conclusion that I have quoted.

In Judge Hall's analysis, he went on to consider what he found to be "a different matter," that is to say the decision, once the bomb had been dropped and fire ensued a number of minutes later, to let the fire continue to burn. It was Judge Hall's conclusion that to permit the fire to burn after the bunker on top of the house had been essentially neutralized could no longer be regarded as in any sense a reasonable law enforcement purpose under the standards of *Tennessee v. Garner* and Pennsylvania Criminal Code Section 508. It was Judge Hall's conclusion that the decision to let the fire continue to burn was one made jointly by Police Commissioner Sambor and Fire Commissioner Richmond. It was Judge Hall's conclusion that there was no evidence that Managing Director Brooks acquiesced in this decision and no evidence that the Mayor acquiesced. Indeed, the decision to fight the fire was made by directive of Managing Director Brooks to Police Commissioner Sambor who in turn relayed that either to the Deputy Fire Commissioner or the Fire Commissioner himself. And Managing Director Brooks heard almost simultaneously from the Mayor and relayed to the Commissioners the Mayor's determination that the fire must not be permitted to

go unfought, that it was time for the fire to be addressed directly. Unhappily, as we know, the efforts to fight the fire, once those efforts got underway, were unavailing for a very long time. And enormous devastation ensued, not only at 6221 itself, the rooftop of which apparently had gasoline in a drum or drums on top of it, but also in surrounding houses.

Judge Hall concluded therefore that the federal claims were entertainable as against Commissioners Sambor and Richmond since they had jointly made the decision not to fight the fire right away. But Judge Hall recommended that the federal claims not be pursued as against the Mayor and the Managing Director since they were, on Judge Hall's analysis of the facts, uninvolved in the decision to let the fire burn. Judge Hall concluded that the decisions of the Police Commissioner and Fire Commissioner to let the fire burn for a time were decisions which in turn entitled Ms. Africa to sue the City of Philadelphia. The argument against suit against the City is essentially this, and it was this that the City pressed vigorously and has continued to press. Under the federal law governing a Section 1983 claim, a municipality is responsible for the constitutional torts, for example the alleged unlawful behavior, of its employees, where there is a demonstration that the municipality has essentially condoned a pattern or practice of unconstitutional conduct or, if there be no such pattern or practice of unconstitutional conduct, if, as in the present case, there be simply a single instance of allegedly unconstitutional conduct, that that conduct had been approved at the highest levels of municipal policy-making.

The position of the City has been that decisions in which the Managing Director and the Mayor did not concur were not decisions made at the highest level of municipal policy-making within the meaning of the Supreme Court cases—*Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), and those which have followed *Monell*—which explicate these doctrines. Judge Hall concluded that the Commissioners were placed high enough in the scale of authority so that their decisions were chargeable to the City under federal law.

Judge Hall also concluded that Commissioners Sambor and Richmond were suable under state law since there is liability for municipal officers for what is called, among other things, "willful misconduct." It was Judge Hall's view that a jury might so characterize the conduct of the Commissioners. That at least was a factual determination which was tenable on the record, and therefore, they were suable. And Judge Hall concluded also that the City of Philadelphia could be sued under state law at least with respect to the alleged misconduct of Commissioner Sambor, since, as of the time of Judge Hall's report and recommendation, there appeared to be a basis in the city code for acquiescence by the City of Philadelphia in liability for misconduct, tortious misconduct, by police officers. This is an issue which we will come back to later.

In this court, on review of Judge Hall's report and recommendation, we are faced with exceptions taken both by Ms. Africa through her backup counsel Mr. Dennis on the one hand and with exceptions taken by the City, by Commissioner Sambor and Commissioner Richmond, and by those other defendants who have not yet been dropped from the case under Judge Hall's analysis. No exceptions were taken, of course, by Mayor Goode or Managing Director Brooks since the report and recommendation had cleared them of liability.

The first matter to be considered is plaintiff's exceptions to Judge Hall's determination that the decision to drop an explosive device, a bomb, notwithstanding its tragic consequences, could, when taken on the basis of the information known to those who made the decision at the time it was decided, have been deemed reasonable under the standards of *Tennessee v. Garner.* The question is an extremely close one. One cannot but be deeply troubled trying to imagine the stresses which could have led decision-makers to authorize so extraordinary a law enforcement measure. However, I am persuaded that, as close as the issue is, Judge Hall's analysis of that aspect of the case is correct and that qualified immunity is available to the defen-

dants, as Judge Hall concluded, with respect to the decision to drop the explosive device.

■ We turn next to the decision to let the fire burn. Here, of course, the exceptions are taken principally by Commissioners Sambor and Richmond since Judge Hall concluded that that was an untenable decision under the *Tennessee v. Garner* standards. He could not find a necessity which warranted letting the fire burn. In particular, the Commissioners challenge Judge Hall's analysis on the basis of what they read his decision to be, namely that Commissioners Sambor and Richmond decided to let the fire burn *after* the bunker on the top of 6221 had been effectively neutralized. It is argued that there is no evidence to support that construction of the decision made by the Commissioners. The evidence shows rather, so it is contended, that the decision made by the Commissioners was to let the fire burn *until* the bunker was neutralized, at which point efforts would be made to combat the blaze.

In reviewing this record and the recommended decision as contained in Judge Hall's report and recommendation, I have focused on the decision to let the fire burn at all. It appears that no flame was detected for a number of minutes after the bomb itself fell on the rooftop. The bomb itself fell at about 5:30. At some later point, fire was visible. The record, I think, is uncertain as to whether that would have been twenty of six, quarter of six, ten of six, somewhere in that neighborhood. And the ambiguities of course involve where one observes from and what constituted evidence of fire. However, in addressing the decision to let the fire burn at all, which is the view that I am addressing in this decision, I start with the testimony of Managing Director Brooks who in effect had been the superintendent of Police Commissioner Sambor's decision to drop the bomb, a decision that had to be ratified of course by the Managing Director and in turn by the Mayor before being carried out.

Managing Director Brooks gave the following testimony on October 16, 1985 before the MOVE Commission, the Commission appointed by the Mayor and chaired by William H. Brown, III, to inquire into the events of May 13, 1985. The questioner was William B. Lytton.

Q. Now, as I understand what you said with regard to the effect that this explosive device would have, you said it might blow the bunker off the roof, is that correct?

A. Yes, it was an expectation that, because the bunker protruded by some 12 to 20 inches off the edge of that roof, it might fall off.

Q. Now, if the bunker didn't fall off, but you had the hole in the roof, what were you going to do?

A. Well, the bunker would have been—by dropping that explosive on that roof, the bunker would have been pretty much neutralized even if it didn't knock it off.

Q. What would you have done? What was the plan if—let's say the bomb drops, the hole is in the roof, the bunker is still there. What do you do next?

A. The teams were on the ends of the roof and they would then proceed up to the hole and insert the tear gas, the concussion devices and the smoke.

Q. Now, when you say the bomb would neutralize the bunker even if it didn't knock it off, what do you mean?

A. It would be very difficult to stay up there.

Q. Well, did you feel there was any discussion that if there were any human being inside that bunker, he would be injured or killed to the point or injured to the point that he would not be able to take offensive action?

A. I think so.

What was the decision taken by Commissioner Sambor and Commissioner Richmond? In testimony of Commissioner Sambor, the Commissioner was asked whether he had instructed the Fire Commissioner to let the bunker burn.

A. I did not order the Fire Commissioner to do anything. I requested of him that if we let the roof burn to get the bunker, could we then subsequent to that control the fire.

Q. If we consider the word 'tells' as something other than order is it accurate?

A. Yes, sir. It was a recommendation and a request. I wanted to get the bunker. I wanted to be able to somehow have tactical superiority without sacrificing any lives if it were at all possible. And in that vein, I asked him—I'm a police officer. I am not a firefighter. I asked him for his concurrence that if we let the roof burn to get the bunker, could we then control the fire. And whatever the response, it was in the affirmative.

Commissioner Richmond also gave testimony with respect to the decision to let the fire burn.

Q. I'm asking you could you have said—I mean was it within your authority to have said no, I've got to put this fire out now and proceed to do what you could to put it out?

A. No, it was not within my authority. If there was a disagreement between Sambor and I, it would have been resolved at Brooks' level.

Q. So you're saying if you had disagreed with Commissioner Sambor's, premise to let the fire burn, that you would have gone to Brooks to have him decide what you should do.

A. That's correct.

Q. Did anybody on the scene that you know disagree with letting that fire burn?

A. There were only two people involved in that decision. The answer is no.

Q. I didn't ask you about the decision.

A. Not to my knowledge.

Q. Now, do you remember at all stating that you would characterize the decision to let the bunker burn as a strong recommendation from Police Commissioner Sambor?

A. · I think, yes, that sounds familiar.

Q. Now, had the Police Commissioner not asked you that, and let you do what you wanted to do, told you it was up to you, what action would you have taken if any?

Mr. Kennedy [Mr. Richmond's attorney] Objection. It's hypothetical. You can answer the question. It would be speculation on his part.

A. I would have started the "squirts."

We have then a decision taken at the request of Commissioner Sambor to get the rest of the bunker. Was it necessary in *Tennessee v. Garner* terms to get the rest of the bunker? Managing Director Brooks has testified that the bunker had to have been in effect substantially neutralized simply by the impact of the bomb on the roof. There is nothing in the record to show that the bunker had been utilized in any way as a fortification by those inside of the MOVE house after the dropping of the bomb—or even to any significant extent or even at all for some substantial time before the dropping of the bomb. The testimony of Managing Director Brooks, who was apparently in a position to observe the rooftop fairly clearly, was that, after the dropping of the bomb, he saw no sign of life on the roof until a dog appeared coming up onto the roof through the hole in the roof and then walking away.

The Commissioners have referred to the dangers to police and fire personnel from those inside the MOVE house. Quite evidently, concerns about how close fire fighters and their equipment could get to 6221 Osage imposed constraints on how effective various techniques of fighting the fire, once the fighting was agreed on to begin, would be. But I cannot conclude that there is a demonstration which leads to the judgment as a matter of law that it was reasonable as a matter of necessity, at the point after the bomb was dropped and when a flame was first visible, for the law enforcement officials to permit flame to continue until it totally consumed what remained of a bunker which was under Managing Director Brooks' perception substantially neutralized on the impact of the bomb. That it might be *convenient* to have let the balance of the bunker be consumed by fire is perhaps a tenable view. That it was *necessary*, in *Tennessee v. Garner* terms, I can find no basis for concluding. And indeed, the very formulation by Police Commissioner Sambor seems to underscore that. By his statement, he said that he wanted to achieve the tactical superiority that would be obtained in removing the balance of the bunker if this could be accomplished without any loss of life. Without such assurance, he would not have made the request that he did. There is nothing in that characterization that

would suggest that he felt that, constrained from letting the fire go forward to consume the balance of the bunker, he would be imposing on his personnel the grave dangers the mitigation of which justifies a *Tennessee v. Garner* decision to use deadly force.

My analysis of this aspect of the case would, I think, be incomplete if I did not refer to the fact that before Judge Hall there was considerable reliance by the defendants on a case decided by a federal court in Arkansas in 1986, *Ginter v. Stallcup*, 641 F.Supp. 939, a case which was subsequently appealed to the Eighth Circuit, which affirmed in part and reversed in part, 869 F.2d 384 (1989). The Court of Appeals opinion is really not particularly significant for our purposes. The much more extended opinion is the district court opinion: It deals with a situation in which a woman sued FBI agents and other local police officers for a fire which had consumed her home when it was apparently being used as a place of refuge by one who was being pursued by the law officers for a violent crime and was perceived to be a very, very dangerous person indeed. And in the attempt to reach that armed accused, a hole was made in the roof, and not only tear gas but incendiary fuel was introduced inside. And there was discussion by the court as to whether that was a constitutionally permissible mechanism of law enforcement.

The court concluded that there was no "clearly established law" to lead to the conclusion that such a "burnout" as a means of forcing a fugitive out would violate the constitutional right of that person, that is, the fugitive. The district court went on to say:

> The courts may, in response to such police tactics as were publicized in relation to the effort to apprehend persons in the M.O.V.E. Headquarters in Philadelphia, PA in 1985, conclude that such methods under such circumstances would violate the constitutional rights of the persons harmed. Indeed, courts might hold on the basis of the facts in this case that the use of fire to "burn out" a fugitive would violate the constitutional rights of the fugitive

> Kahl. But the point is that no court had so held prior to June 3, 1983.

641 F.Supp. at 953 (footnote omitted).

The events in suit in the *Ramona Africa* case and in the *Leaphart* and *James* cases as well took place not in June of 1983 but in May of 1985, two months after the Supreme Court had addressed the use of deadly force in *Tennessee v. Garner*. In this court, there has been no reliance on *Ginter v. Stallcup*, but I had thought it appropriate to address that aspect of the case since it has figured in the case's development up to the stage at which Judge Hall filed the report and recommendation which I am today reviewing. And indeed, he discusses and distinguishes *Ginter v. Stallcup* in his extensive and thoughtful opinion.

Finally, I should say on this aspect of the case that some argument has been made to me in the extended and very valuable oral presentations in this court on December 28, 1993—that is to say just last Wednesday—that the activities of Commissioners Sambor and Richmond must be judged on the basis of what they intended, and since there is no evidence that they intended the devastating and tragic consequences of the decision to let the fire burn, they must be insulated from liability. That is not the law of the Constitution. In *Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), Chief Justice Rehnquist, reviewing prior decisions including earlier opinions of his own, had this to say at page 397, 109 S.Ct. at page 1872. "As in other Fourth Amendment contexts, however, the 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. See *Scott v. United States*, 436 U.S. 128, 137–139, 98 S.Ct. 1717, 1723–1724, 56 L.Ed.2d 168 (1978); see also *Terry v. Ohio*, *supra* [392 U.S. 1], at 21 [88 S.Ct. 1868, at 1879, 20 L.Ed.2d 889 (1968)] (in analyzing the reasonableness of a particular search or seizure, 'it is imperative that the facts be judged against an objective standard'). An officer's evil intentions will not make a Fourth Amendment violation out of an objec-

tively reasonable use of force, nor will an officer's good intentions make an objectively unreasonable use of force constitutional."

Accordingly, it is my view that Commissioners Sambor and Richmond are not entitled to summary judgment on grounds of qualified immunity for their decision to let the fire burn at all. Some argument has been made that Commissioner Richmond, because he was Fire Commissioner and not Police Commissioner, is entitled to have his conduct judged by a somewhat more relaxed standard than that of a veteran police officer. It is apparent that the Fire Commissioner, though he recognized his independent authority, was persuaded that the right course of action was the one to be taken by the senior police officer at the scene, the Commissioner himself. Managing Director Brooks' testimony makes it plain that he regarded the operation with respect to the assault on 6221 Osage as essentially a police operation, and this perhaps explains why his direct communication at the time of communicating his decision that the time had come to put out the fire was made to Commissioner Sambor. Commissioner Richmond opined that had there been no request made by Commissioner Sambor, he, Commissioner Richmond, "would have started the squirts." That is to say he would have moved at once to fight the fire, but he was prevailed on to acquiesce in a decision to let the fire go on for a while.

In that respect, and turning back to the Pennsylvania statute, Section 508, which I have suggested in a significant sense has been given a measure of constitutional status by *Tennessee v. Garner*, it is of interest to remember that the statute is directed to the use of force in making an arrest by a "peace officer." And the statute goes on to explain the authority of "a peace officer or any other person whom he has summoned or directed to assist him." And in a sense transferring that almost quaint statutory language to the situation before us, we have Commissioner Sambor as a peace officer who has summoned Commissioner Richmond to assist him. But I think we disrespect the Constitution if we (1) suggest that a fire commissioner can subordinate his professional judgment

that a fire should be fought but for the request of a police commissioner and (2) at the same time exculpate the fire commissioner from ensuing constitutional liability. And so I think when Commissioner Richmond as it were loaned himself to Commissioner Sambor, he must be held to have acquiesced in the same constitutional standards which Commissioner Sambor was obligated to observe even though Commissioner Richmond may not have been acquainted with the language of Justice White in *Tennessee v. Garner*.

▪ I have said that I conclude, as Judge Hall did, that the two Commissioners are not entitled to summary judgment on qualified immunity grounds though my analysis of the factual record differs in some respects from that pursued by Judge Hall since I have focused on the decision to let the fire go on at all. In one important respect, the case as it stood before Judge Hall has shifted as it has come before me. It will be recalled that Judge Hall recommended that summary judgment be granted in favor of Managing Director Brooks and Mayor Goode on the ground that neither one had any role in the decision to let the fire burn.

On argument last Wednesday, I inquired of Mr. Dennis as backup counsel for Ms. Africa whether there was not some basis in the record for concluding that conceivably Managing Director Brooks concurred for a time in the decision to let the fire burn. Mr. Dennis was not, as I put the question, prepared to make that contention. He and Ms. Africa had not taken exception to Judge Hall's factual analysis as to that aspect of the case. I put it to Mr. Dennis that there was testimony of Commissioner Sambor, deposition testimony, which at least I read as saying that Managing Director Brooks had concurred in the decision to let the fire burn but only to reach the bunker. After giving that testimony some thought, Mr. Dennis said he would revise his position and would indeed take exception to that aspect of Judge Hall's decision. There were substantial and very understandable objections raised from counsel for the affected defendants. And the defendants most particularly affected were Mr. Brooks represented by Mr. Waxman and

the City of Philadelphia represented by Ms. Hix—Mr. Brooks potentially affected because the very question at issue was whether Judge Hall had been right in recommending qualified immunity for Mr. Brooks, the City of Philadelphia at least potentially affected because acquiescence by the Managing Director would change the context in which a decision would be made as to whether the City of Philadelphia was itself potentially liable for the conduct sued on. I was urged that the issue that I had raised and which was prompting Ms. Africa through counsel to change her position on was an issue which was waived. I was also urged very cogently by Mr. Waxman that he in representing Mr. Brooks was put at a substantial and very unhappy disadvantage by a question put at this eleventh hour phase. The City emphatically expressed similar concerns.

It was agreed that Commissioner Sambor, Mr. Morris' client, would be reinterviewed on this very aspect of the case with a view to seeing whether I had misunderstood his testimony or whether he had misspoken himself or whether what I thought I had gleaned from his testimony was indeed close to his meaning. On December 29, a day after oral argument, I received the following letter from Mr. Morris. It runs as follows:

Dear Judge Pollak:

Yesterday's proceedings left an open question concerning the testimony of my client Gregore Sambor. The question has been answered. I have represented the following to other counsel (noted below) [counsel in question being Ms. Hix, Mr. Waxman, Mr. Dennis, and Mr. Fincourt Shelton who is counsel for plaintiff in the *James* case] and they have authorized me to represent to the Court as follows:

Mr. Sambor recalls two separate conversations with Mr. Brooks. In the first conversation, Brooks noted that he could see fire on the roof, and Sambor explained that they were letting the fire get the bunker. As stated in the deposition, Sambor says Brooks concurred saying, 'Only the bunker.' Brooks then called back a few minutes later and relayed the Mayor's order to put out the fire.

Obviously, this represents Mr. Sambor's recollection and not necessarily the position of other parties. However, counsel agree that it may be considered as a clarification of my client's deposition testimony. In light of this clarification, counsel await your advice as to whether we are to reconvene.

I am indebted to all participating counsel for their prompt and effective efforts to clarify the record. I did not reconvene these proceedings given the information which Mr. Morris had so concisely presented. I felt that the record was complete. The argumentation before me had been extensive. I saw no reason to impose upon the parties and their lawyers for further argument before I reached my decision, and I scheduled today's session to announce my decision.

I have received submissions subsequent to Mr. Morris' letter. I have heard from Mr. Dennis, who reemphasizes Ms. Africa's change of position. I have heard from Mr. Waxman and from Ms. Hix reemphasizing their view that there has been a waiver and that the clarification contained in Mr. Morris' letter of December 29 with respect to Commissioner Sambor's testimony should not be considered by me.

Mr. Waxman further argues that there is no other testimony that suggests that Managing Director Brooks did play any role in the decision to let the fire burn, and that this reaffirmation in 1993 of 1991 deposition testimony should not be given any significant credence.

 I address, first, the question of waiver. The submission of the City is:

In *Thomas v. Arn*, 474 US 140 [106 S.Ct. 466, 88 L.Ed.2d 435] (1986), the United States Supreme Court ruled that the Court could determine that failure to object to a recommendation of a magistrate within the applicable time period constitutes a waiver of the objection. A situation, such as the one before this court, where plaintiff affirmatively states that she is not objecting to the recommendation compels the finding that the objection has been waived. The City defendants, therefore, respectfully re-

quest that plaintiff's request to revise her objections be denied.

The City's reliance on *Thomas v. Arn* does not seem to me persuasive. *Thomas v. Arn* was a case in which the Supreme Court approved a rule adopted by the Sixth Circuit under which one who fails to file objections to a magistrate's report and recommendation within a specified ten-day period forfeits the right to seek review by the court of appeals of the magistrate's rulings with respect to which no exception has been taken. *Thomas v. Arn* arose in the context of exactly that—a lawyer who, notwithstanding that the lawyer had been given an extension of time to file exceptions, did not do so. The district court, on reviewing the magistrate's report and recommendation, nonetheless decided on its own initiative to examine the report and recommendation *in extenso* and approved it.

The petitioner then went to the Court of Appeals to challenge the adverse ruling. And the Court of Appeals, relying on the procedural rule which it had announced in an earlier case as an exercise of its supervisory authority said, by not filing your exception within the stated time, or within the extended time, you, petitioner, lost your entitlement to get appellate review by this Court. The Supreme Court of the United States said that was an acceptable procedural rule if the Sixth Circuit wanted to have such a rule. That would be a rule that a court of appeals could or could not adopt as it chose.

In the course of the opinion in *Thomas v. Arn*, which approved the Sixth Circuit's decision—an opinion which was not unanimous—Justice Marshall, who wrote for the Court, said:

> The District Judge has jurisdiction over the case at all times. He retains full authority to decide whether to refer a case to the magistrate, to review the magistrate's report and to enter judgment. Any party that desires plenary consideration by the Article III judge of any issue need only ask. Moreover, while the statute does not require the judge to review an issue *de novo* if no objections are filed, it does not preclude further review by the district judge *sua sponte* or at the request of a party under a *de novo* or any other standard.

So said Justice Marshall for the Court in 1986.

The Court of Appeals for the Third Circuit has had occasion to consider this general problem subsequent to *Thomas v. Arn*. In *Henderson v. Carlson*, which was a year later, 812 F.2d 874, 878 (3d Cir.1987), our Court of Appeals was pointing out that, unlike some other circuits, our Court of Appeals has not adopted a rule such as that adopted by the Sixth Circuit. The Third Circuit could understand why such a rule might be adopted, but it had found no reason to preclude appellate review by it even in the curious situation in which a lawyer failed in his or her professional duty to file exceptions to a magistrate's report.

In the course of its opinion the Third Circuit said this:

> Leaving to one side the baggage that the rule carries, we detect a more fundamental problem with the waiver rule. Whether or not objections are made to the magistrate's report, under § 636(b)1(C) the district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate." While this statutory provision may not require, in the absence of objections, the district court to review the magistrate's report before accepting it, *see Arn*, [474 U.S. at 151], 106 S.Ct. at 472–73, we believe that the better practice is for the district judge to afford some level of review to dispositive legal issues raised by the report. "The authority—and the responsibility—to make an informed, final determination . . . remains with the judge." *Mathews v. Weber*, 423 U.S. 261, 271, 96 S.Ct. 549, 554, 46 L.Ed.2d 483 (1976). Given this responsibility, it must be assumed that the normal practice of the district judge is to give some reasoned consideration to the magistrate's report before adopting it as the decision of the court.

*Ibid.*

Under this advice from the Supreme Court as to what a district judge may do and

additional advice from the Court of Appeals as to what a district judge ought to do, it seems to me I would be derelict if I concluded that I could not look at the record as it existed on December 28 and as subsequently clarified on December 29 in making my decision on whether to sustain this aspect of Judge Hall's report and recommendation. I find no ground for concluding, since counsel have had the opportunity, all of them, of seeing that the matter was appropriately put to Commissioner Sambor, and have also had the opportunity of commenting on Commissioner Sambor's clarifying statement, that any prejudice ensues to any party, and most particularly to the City and Managing Director Brooks, by my considering the record as now clarified. I do so.

And, on that basis, it is clear to me that Managing Director Brooks is not entitled to qualified immunity at this stage since a jury may conclude that he indeed acquiesced for at least a time in the decision to let the fire burn. Of course, a jury may conclude otherwise but that will be in the province of the jury. The matter should not be withheld from jury cognizance.

■ With Managing Director Brooks remaining in the case, we consider the question of the City's suability. I have already explained the City's position that final decision-making authority lies with the Mayor and the Managing Director. The record as enlarged by Commissioner Sambor's statement of December 29 permits—it doesn't compel, but permits—the possibility of a decision by a jury that Managing Director Brooks was a participant in the decision to let the fire burn.

The City's latest submission contends that only the Mayor had final decision-making authority and that when the matter came to the Mayor's attention he said, no, the fire should be fought at once. Thus, in the City's revised view, the Managing Director does not have sufficient authority to implicate the City.

The Charter describes the various functions of the major figures in the City. Of course, the Mayor is the chief executive of the City, but the Managing Director, as stated in Section 5.5–100 of the Home Rule Charter, is said to have the following authority:

The Managing Director shall exercise supervision over all activities of those departments whose heads he appoints and the boards and commissions connected with such departments and shall be the contact officer between the Mayor and such departments, boards and commissions.

Pa.Code, 351 § 5.5–100.

The officers who are appointed by the Managing Director include the Police Commissioner and the Fire Commissioner. The annotation to the section that I have read states that:

The Managing Director, appointed by the Mayor, is the Mayor's personal assistant and has under his charge the departments of the City rendering municipal services to the people of the City. The Managing Director has the duty of supervising these departments and the boards and commissions connected with them. He appoints, with the approval of the Mayor, the heads of all such departments. The department heads are responsible to the Managing Director who in turn is responsible to the Mayor. To vest authority commensurate with the responsibility given to him, the Managing Director is made the contact officer between the Mayor and the departments, boards and commissions under his supervision; service department heads will thus report to their superior, the Managing Director, and not to the Mayor.

Confirmation of this in practice is certainly reflected in Commissioner Richmond's testimony that, in the event of a dispute between himself and Commissioner Sambor, the matter would be referred to Managing Director Brooks.

I conclude that the suability of Managing Director Brooks means also that the City is suable by virtue of the potential determination that Managing Director Brooks concurred for a time in the fire.

The City's argument that only the Mayor had authority to make a final decision, and

that the Mayor, when he made his decision, vetoed letting the fire burn, seems to me to carry the actual structure of the management of a great city's affairs into an obscure metaphysical never-never-land. The suggestion would be that under the Constitution as implemented by Congress in Section 1983 of Title 42, no decisions are ever made except by the very highest decision-maker, in this instance, the Mayor of the City of Philadelphia.

Given the careful delineation of authority made by the Home Rule Charter which places critical responsibility in commissioners themselves for the departments they head and even more critical decisional authority in the hands of the Managing Director, I reject the view of the City that without the acquiescence of Mayor Goode there can be no potential liability on the City's part with respect to the Section 1983 claim.

My analysis has been predicated on a view of the record that recognizes that a factfinder could find that there had been acquiescence by the Managing Director in the decision to let the fire burn. I recognize that this is a highly contested factual issue and it may well be that a fact-finder would find, as Managing Director Brooks, certainly through his counsel, insists, that he had no such participation.

In view of that state of the record, I would add that if we assume the Managing Director did not participate in the decision to let the fire burn, and instead that we had a scenario in which the decision was made by the two Commissioners jointly, and only after some time passed the Managing Director stepped in and, first on his own authority, and then on the Mayor's authority, said fight the fire—if we assume that to be the accurate factual scenario, it is my conclusion that within the teaching of the cases that have followed *Monell* and that have undertaken to elucidate where finality lies, and I have in mind *Pembaur* [*Pembaur v. Cincinnati*, 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986)] and the case whose name escapes me, but Ms. Hix will remember because she and I talked about it, *Pro—*

MS. HIX: *Propratnik* [*Praprotnik*].

THE COURT: *Propratnik* [*St. Louis v. Praprotnik*, 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988)] yes. Within the authority of those two cases, in the organization of the City of Philadelphia, under its Home Rule Charter, the statutory authority of the two Commissioners is of such consequence that during the period in which they make effective decisions, they must be regarded as having the authority to make final decisions within the meaning of those cases. I stress the fact that § 3.3–101 of the Home Rule Charter provides that:

> Each department shall have as its head an officer who either personally or by deputy or by a duly authorized agent or employee of the department, and subject at all times to the provisions of this charter, shall exercise the powers and perform the duties vested in and imposed upon the department.

Pa.Code. 351 § 3.3–101.

Under § 5.5–200:

> The Police Department shall have the power and its duty shall be to perform the following functions:
>
> (a) *Law Enforcement.* It shall preserve the public peace, prevent and detect crime. . . .

Pa.Code. 351 § 5.5–200.

As to the fire department, § 5.5–400 provides:

> The fire department shall have the power and its duty shall be to perform the following functions:
>
> (a) *Fires.* It shall extinguish fires at any place within the limits of the City
> . . .

Pa.Code 351 § 5.5–400.

So that if it were the case that the Commissioners made the decision without any overt acquiescence of the Managing Director until the point arrived at which that decision was superseded, I would conclude that they had sufficient authority to make final decisions attributable to the City of Philadelphia.

 With the balance of this case, I will undertake to be brief. You have all shown extraordinary patience in staying with me this long. I agree with Judge Hall that Ms.

Africa's claims under the First and Fourteenth Amendments are unavailing since there is no evidence to substantiate her claim that her free speech and freedom of religion interests were being violated by the defendants or any of them. So, too, the conspiracy charge under Section 1985(3) fails for the reasons presented by Judge Hall. There is no evidence of a racial or class or caste-based conspiracy against Ms. Africa.

■ With respect to the claims under state law, I conclude that Commissioners Sambor and Richmond are suable on the state law claims since they could be perceived as having engaged in "willful misconduct," to use the state statutory term. I do not say that that is in any sense a necessary reading of the record, but it is simply that that is a factual question which ultimately is to be addressed by a jury.

So, too, in view of my decision to address this record in its more broadly clarified status with respect to Managing Director Brooks, though Judge Hall would have dismissed him from liability on the state claims, I believe that he is not entitled to summary judgment with respect to the state claims.

■ The City is, however, right, though not for the reasons argued before Judge Hall, that it, the City, is not liable on the state law claims. Before Judge Hall, the City relied upon the relatively recent—I think it was 1990—repealer by the City Council of a City ordinance which expanded the area of suability of the City with respect to the conduct of police officers beyond that contemplated by the state statute that deals with the tort liability of political subdivisions.

Relying on the repealer, the City argued that Ms. Africa could not sue the City because her case was pending at the time of the repealer. Judge Hall rightly rejected that argument in the face of the then applicable law since both decisions of the Commonwealth Court and, indeed, of this court had recognized that there were remarkable constitutional problems presented by a retrospective attempt to insulate oneself from liability for actions that had already taken place.

However, on November 3, 1993, the Supreme Court of Pennsylvania in the case called, *Philadelphia v. Gray*, 534 Pa. 467, 633 A.2d 1090, came to the interesting conclusion that the City Council of Philadelphia had never had authority to expand the categories of cases in which it could be suable beyond those contemplated by the Pennsylvania Political Subdivision Tort Claims Act. And, so for that reason, as Judge Hall recognized in a report and recommendation issued subsequent to the *Ramona Africa* report, the City is insulated from liability on the state claims.

That completes my analysis of the problems to be addressed on review of Judge Hall's report and recommendation. And, I will embody what I have announced in a written order, which I will undertake to file tomorrow.

### *REPORT AND RECOMMENDATION*

Filed Oct. 6, 1993.

HALL, United States Magistrate Judge.

This is an action for damages brought by Ramona Africa, a MOVE member, pursuant to § 1983 and § 1985(3) of the Civil Rights Act of 1871, 42 U.S.C. §§ 1983, 1985(3). She has also raised claims based on state law and directed to our pendent jurisdiction. The main part of the plaintiff's suit is a claim of excessive force in the execution of search and seizure warrants, based on the action of the Philadelphia police and other City and state government officials on May 13, 1985. The plaintiff claims that this alleged constitutional tort not only caused her to suffer burns of her body, but also that the defendants' action that day deprived her of the freedom of religion and association guaranteed by the First Amendment of the federal constitution. The plaintiff further claims that the defendants' actions constituted a conspiracy to deprive her of her constitutional rights in violation of 42 U.S.C. § 1985(3). For the wrongs alleged, she seeks compensatory and punitive damages.

### I. *EXCESSIVE FORCE CLAIMS*

A. The Act of Dropping the Bomb on the MOVE Residence.

On March 26, 1992 I filed a Report and Recommendation in which I recommended

the denial of motions for summary judgment on qualified immunity grounds filed by defendants, W. Wilson Goode, Leo Brooks, Gregore Sambor, William Richmond, Frank Powell, William Klein, Morris Demsko and Richard Reed. In the same Report and Recommendation it was recommended that the motions for summary judgment filed by defendants Michael Tursi, Albert Revel and Edward Connor should be granted on qualified immunity grounds. On August 18, 1992, the Honorable Louis H. Pollak entered an order approving and adopting the Recommendation pertaining to the latter defendants.

The remaining defendants filed timely objections to the Report and Recommendation; and on December 8, 1992, Judge Pollak issued a memorandum which in effect rejected the Recommendation and remanded the matter for further consideration.

The basis for my recommended denial of the defendants' motions for summary judgment was summarized by Judge Pollak in his memorandum as follows:

In his Report and Recommendation, Magistrate Judge Hall decided that the defendants involved either in the plan to drop the bomb on the MOVE residence or in the decision to let the bunker burn should not be granted qualified immunity at the summary judgment stage. On his view, the qualified immunity question was inextricably intertwined with the unresolved merits of plaintiff's excessive force claim, since each turned on the same question—whether, under the totality of the circumstances, the use of force in question was "objectively reasonable." Applying this unitary standard of objective reasonableness, Magistrate Judge Hall found that there was sufficient record evidence to support a jury finding that the use of the bomb constituted excessive force and that each of the remaining defendants, with the exception of Fire Commissioner William Richmond, was involved in the plan to drop the bomb. Similarly, Magistrate Judge Hall determined that a juror could conclude that allowing the fire to continue to burn to facilitate the arrest of the MOVE occupants was objectively unreasonable,

and that the decision had been made or approved by defendants Sambor, Richmond, Brooks, and Goode. Accordingly, Magistrate Judge Hall recommended that a decision on whether the movants had qualified immunity for the harm caused by the dropping of the bomb and ensuing fire should await trial.

Memorandum, Pollak, J. at 5–6.

Based on his extensive analysis of the law governing qualified immunity determinations, Judge Pollak was not persuaded that summary judgment should be denied. Instead, he thought that the matter should be remanded to me for further consideration in light of the views expressed in his Memorandum. *Id.* at 2. The standard that Judge Pollak determined should have been applied was summarized in his Memorandum as follows:

[T]he court must determine, on *plaintiff's* well-documented version of the facts, whether a reasonable officer in each defendant's position, to the extent that this defendant could be found to have some responsibility for the use of force in question, could have believed that the force employed was necessary to protect the safety of himself or others. *See Good,* 891 F.2d at 1092, 1094–95. If the answer to that question with respect to any of the defendants is in the affirmative, then summary judgment should be granted in his favor; by contrast, for those defendants to whom the answer is in the negative, summary judgment on qualified immunity grounds should be denied (though it may be raised anew once facts are further developed and explored at trial).

Accordingly, I will remand this case to Magistrate Hall so that he can apply the new standard discussed above, indicating on which parts of the record he is relying for plaintiff's version of the facts.

*Id.* at 17–18. (emphasis as in original) (footnotes omitted).

In my Report and Recommendation, as Judge Pollak noted, I viewed the dropping of the bomb and the decision to let the fire burn to be the critical conduct that precluded the grant of summary judgment on qualified immunity grounds for all of the defendants

except Connor, Revel and Tursi. In reviewing the validity of the defendants' claim of immunity, I did not consider either the reports of the federal and state grand juries or the *Report* of the MOVE Special Investigation Commission. The City defendants objected to the Report and Recommendation based, in part, on their belief that it contained factual determinations which had no support in the record but were instead, derived from the MOVE Commission Report.[1] Objections of Defendants' City of Philadelphia, W. Wilson Goode, Leo Brooks, Gregore Sambor, William Richmond, Frank Powell to the Report and Recommendation at 3–4 (hereinafter, "City Defendants' objections").

Among those allegedly unsupported facts in pages 13 through 15 of the Report and Recommendation were the following assertions:

> Implementation of Plan B began with the police creating a bomb consisting of "Tovex", an industrial explosive, and "C–4", a military explosive.

Report and Recommendation at 13. This statement was described as being specifically contradicted by the record. City Defendants' Objections at 3–4. The record, however, refutes that claim because in its pleadings, the City defendants admitted that the bomb consisted of "Tovex" and "C–4."

As set forth in the Report and Recommendation, many lawsuits, separate from the present one, were filed in this court following the events of May 13, 1985. The defendants filed answers and other pleadings. In their answers they raised affirmative defenses including that of qualified immunity. Those lawsuits were consolidated by Judge Pollak under Civil Action No. 85–2745. The City defendants then joined Ms. Africa as an additional defendant. Her motion to dismiss the third party complaint was denied.

On May 7, 1987, Ms. Africa filed this action, and on May 27, 1987, it was added to the consolidated Civil Action No. 85–2745 (Document No. 3). However, the City defendants did not file an answer to Ms. Africa's action until December 10, 1991 (Document No. 16). In their answers, the defendants asserted affirmative defenses which included qualified immunity. In response, the plaintiff moved to strike the affirmative defenses on the grounds that the defendants' answer was not timely filed. (Civil Action No. 85–2745, Document No. 646). The defendants then filed a response in opposition to the plaintiff's motion to strike (which was ultimately denied) averring, *inter alia*, that:

> All pending cases arising out of the May 13, 1985 MOVE incident in the federal court system have been consolidated under the Master File No. 85–2745.

> As the attached pleadings clearly indicate, plaintiff was fully aware of *all* affirmative defenses, even prior to filing the *subject law suit* (emphasis as in the original).

City Defendants' Response to Plaintiff's Reply in Support of its Motion to Strike Defendants' Affirmative Defense (sic) at 3.

The City defendants attached to its response Exhibits "B" through "K" and averred that "[the attached Exhibits] indicate that both the plaintiff and her counsel received pleadings which made them well aware of all [of] the City Defendants' affirmative defenses." *Id.* "Exhibit G" is the Answer of Defendants Powell, Klein, Tursi, and Revel in *Daniel Gaddie, et al. v. Frank Powell, et al.*, Civil Action No. 85–6531 dated January 20, 1986. In the following paragraphs of the answer, details of the bomb were given:

> 7. Denied as stated. It is admitted that defendant Powell was the commanding officer of the Bomb Disposal Unit and that he did drop a satchel charge unto the roof of 6221 Osage Avenue on May 13, 1985. Otherwise denied.

---

1. The *sole* reference to the MOVE Commission Report in the Report and Recommendation is in the following paragraph at page 5:

 Following the tragic events of May 13, 1985, a Special Investigation Commission was established by Mayor Goode and the events were also investigated by a state, as well as a federal grand jury. Hundreds of pages of findings and reports were made by these bodies and there were months of extensive media coverage.

 The transcripts of the *sworn testimony* given before the MOVE Commission and referred to in the appendices to the City defendants' motion for summary judgment, however, have been considered.

8. Denied as stated. It is admitted that defendant Klein was the member of the Bomb Disposal Unit who prepared the satchel charge. Otherwise denied.

30. Admitted in part; denied in part. *Defendant Klein admits that the satchel charge contained both Tovex and C–4.* Otherwise, denied. (Emphasis added).

*Id.*, Exhibit G. Exhibit I is the answer of defendants, Goode, Brooks, Tate, White, Sambor, Richmond, Powell, Klein, Tursi, Revel, and the City of Philadelphia in *Cassandra Carter, et al. v. City of Philadelphia,* Civil Action No. 85–6558. In the answer, the defendants provided further details about the bomb as follows:

95. Denied as stated. It is admitted that defendant Powell did drop a satchel charge onto the roof of the MOVE house from a helicopter owned by the Commonwealth of Pennsylvania and piloted by defendants Reed and Demsko; that this occurred at approximately 5:30 p.m. on May 13, 1985; *and that defendant Klein did construct the charge with Tovex and C–4.* Otherwise, all allegations set forth in this paragraph are denied. (Emphasis added).

*Id.,* Exhibit I. It is noteworthy that in paragraph 96 of the defendants' answer in Exhibit I, the defendants admitted that "the office of the Fire Marshal [had] issued a report concluding that the fire was caused by the mechanical ignition of combustible liquid vapor, occurring as a result of detonation."

Evidence that the bomb consisted of Tovex and C–4 is also found in the deposition of defendant Klein on July 10, 1991.

By Ms. Africa:

Q. Now, you also testified that Sambor and Brooks believed they wanted to know what two pounds of plastique would do?

A. Yes, I believe it was Brooks wanted to know it.

Q. So. Brooks wanted to know what two pounds of plastique would do. You felt like, in talking about plastique, he was talking about C–4?

A. Yes.

Q. Now, when you made the bomb, you had two pounds of Tovex and one and-a-quarter pounds of C–4?

A. Yes.

Q. Well, if the discussion was about two pounds of explosive, how did it go to three and-a-quarter pounds?

A. Let's go back a little tiny bit. He [Brooks] asked what would two pounds of plastique do. I told him C–4 comes in pound and-a-quarter. It was my impression we were going to use two-and-a-half pounds of C–4 in the bomb. When I went back into the box, all I could find was the C–4 that I had. I had to add Tovex to it because I couldn't find anything else. That's how Tovex got into it.

Q. Rather than adding one and-a-quarter pound of C–4, you added Tovex to the one and-a-quarter pound?

A. Yes. Tovex, I've never even heard of before the year before—I knew about it for about a year. All my career, I never even heard of Tovex until probably 1984.

Q. So, it was something relatively—

A. I didn't know, you know, I didn't use it whole lot. If I used it a couple times, it was a lot. I just didn't know what it done, or what it was really—my impression it was used for mining, Tovex.

Q. So, you were prepared to use two pounds of something you weren't even—

A. Two and-a-half. I know it was C–4.

Q. I'm talking about two pounds of Tovex?

A. Yes.

Q. And you didn't really know what—

A. No. I felt it was less powerful than C–4. How much less powerful, I didn't know.

Q. Less powerful in conjunction with one and-a-quarter pounds of C–4?

A. Yes.

Q. When you had this discussion with Managing Director Brooks, was Lieutenant Powell present also?

A. Yes.

Q. Is it your understanding he heard this conversation as well?

A. Yes.

Deposition of Defendant Klein at 66–67.

The depositions of Lieutenant Powell and Officer Klein differ somewhat as to who actually manufactured or constructed the bomb as distinguished from the question of who created or designed it. Officer Klein stated that although it was his impression that the bomb was to consist of two and one-half pounds of C–4, he discovered that he had only one and one quarter pounds of C–4 and that he had to add Tovex to it because he could not find anything else. Deposition of Officer Klein, July 10, 1991 at 67. Lieutenant Powell, on the other hand, testified that he told Commissioner Sambor that instead of putting shrapnel in the bomb, an ingredient he said Sambor had suggested, he put Tovex in the bomb because they had plenty of Tovex. Deposition of Powell, July 10, 1991, at 26. In any event, there can be no dispute that a bomb consisting of military [2] and commercial explosives, i.e., C–4 and Tovex, was dropped on the roof of the MOVE residence by Lieutenant Powell.

It is fair to conclude, therefore, that when the police resorted to the use of the bomb after having failed to penetrate the MOVE house through the adjoining house in order to infiltrate it with tear gas, they had introduced an increased and unconventional level of violent force. It may also be fairly said that one of the undeniable characteristics of that tactic is that it applied to the roof of an urban rowhouse [3] explosive components of industrial and military strength.

**2.** In his deposition, defendant Klein in describing C–4 said that the "army calls C–4 plastique. The Marines call it C–4. When somebody says plastique to me, it's automatically C–4". Deposition of Officer Klein at 33.

In his deposition Lieutenant Powell testified about the police department's acquisition of C–4 as follows:
*By Ms. Africa:*
Q. How do you get C–4?
A. From the military, usually.

\* \* \* \* \* \*

Q. What's the procedure for using or obtaining explosives from the bomb disposal unit for testing, for use, whatever?
A. For us obtaining it?
Q. Yes.

After the bomb was dropped, a fire started. There is evidence in the record that the fire was caused by the detonation of the bomb. *See supra* at 350. Moreover, there is evidence that once started, the fire was allowed to burn out of control on the orders of either Police Commissioner Sambor or Fire Commissioner Richmond.

In that regard, Commissioner Sambor testified as follows before the MOVE Special Investigation Commission:

Q. Let me ask you this. At five of 6:00 that evening did you tell the Fire Commissioner to let the bunker burn?

A. I did not order the Fire Commissioner to do anything. I requested of him that if we let the roof burn to get the bunker could we then subsequent to that control the fire.

\* \* \* \* \* \*

Q. If we consider the word "tells" as something other than order is it accurate?

A. Yes, sir. It was a recommendation and a request. I wanted to get the bunker. I wanted to be able to somehow have tactical superiority without sacrificing any lives if it were at all possible. And in that vein I asked him—I'm a police officer. I am not a firefighter. I asked him for his concurrence, that if we let the roof burn to get the bunker, could we then control the fire. And whatever the response was, it was in the affirmative.

A. If we obtain commercial explosives, we just go to a commercial outfit that sells it, present our license, and they sell it to you over-the-counter.
Q. What about C–4?
A. C–4 we used to have to get from the military generally. C–4 is generally only sold to the military and they give it to us.
Deposition of Lieutenant Powell at 30.
During oral argument on the City defendants' motion for summary judgment, counsel for defendant Powell represented to the court that C–4 is a military explosive. Motion hearing, February 28, 1992 at 54.

**3.** Judicial notice is taken of the fact that the MOVE house was one of adjoining rowhouses on Osage Avenue.

We then proceeded. Shortly thereafter, sometime thereafter—I don't know whether it was five, ten minutes, or whatever— we received a call from the Managing Director on the radio, that he had spoken to the Mayor. The Mayor was concerned about the flames....

\* \* \* \* \* \*

Q. Do you know whether by that hour, which is actually 6:27 in the evening, whether or not there had been any order to put the fire out?

A. Yes, sir. To the best of my recollection, the Managing Director sometime prior to that and sometime prior, subsequent to our discussion, whether it was five minutes, ten minutes, I don't recall.

\* \* \* \* \* \*

Q. After that order was given to put the fire out and turn the water on, did you convey that order to anyone else?

A. Yes, sir.

Q. To whom?

A. The Fire Commissioner was still there.

Q. And once that order was given, was it carried out?

A. There was water turned on, sir, and it was also turned off again, and turned on again and turned off again, because of conditions at the scene. I did not pay specific attention to the duration or the frequency.

Q. Who made the decision to turn off the water once it had been turned on?

A. It was not I.

Q. Who was it?

A. I don't know.

Q. Did you ask—did you notice that the water was not on after—

A. I heard people yelling that we could not see because of smoke and water, and— subsequent to that. So I presume, and as I said, the water was turned on and off several times.

Q. Did you try and find out why the water was not on?

A. Not particularly, sir.

Q. Why not?

A. Because it was not my job.

Q. Whose was it?

A. The Fire Department's.

Q. Commissioner Richmond?

A. Commissioner Richmond is the Commissioner of the Department but—I don't think that, under extreme conditions, that people have to wait for orders. So we try and be specific. As to whether they had to wait for Bill Richmond to give the order, I can't answer that.

Q. At this point, Commissioner, was this a fire operation or still a police operation, or some combination of both?

A. It was a combination of both.

Q. Is it your testimony that it was not your job in this combination situation to tell the Fire Commissioner to fight the fire?

A. I don't know anything about fighting fires, sir. And it would be presumptuous of me to try and tell him how to fight one. I wouldn't even know where to begin.

Appendix to City Defendants' Motion for Summary Judgment, Volume I at 141–145.

In his deposition, Fire Commissioner Richmond testified that he was aware that the fire started "sometime after 5:30 p.m." or ten to twelve minutes after the bomb was dropped. Richmond Deposition, July 10, 1991, at 19. The Fire Commissioner's version of who had responsibility for controlling the fire differed from that of the Police Commissioner.

By Ms. Africa:

Q. When it was agreed to let the fire burn, could you, on your own, as fire commissioner, decide that you could not do that, that, you know, you needed to put the fire out then?

A. Could I have?

Q. Yes.

A. I could have articulated that to Sambor, yes.

Q. What about actually doing it?

A. No, I did not. I told him I thought we could control the fire.

Q. I'm asking you, could you have said—I mean was it within your authority to have

said no, I got to put this fire out now and proceed to do what you could to put it out?

A. No, it was not within my authority. If there was a disagreement between Sambor and I, it would have been resolved at Brooks' level.

Q. So, your saying if you had disagreed with Sambor's, you know, premise to let the fire burn, that you would have gone to Brooks to have him decide what you should do.

A. That's correct.

Q. *Did anybody, on the scene, that you know or disagree with letting that fire burn?*

A. *There were only two people involved in that decision. The answer is no.*

Q. I didn't ask you about the decision.

A. Not to my knowledge.

Q. Now, do you remember at all stating that you would characterize the decision to let the bunker burn as a strong recommendation from Police Commissioner Sambor?

A. I think, yes that sounds familiar.

Q. Now, had the Police Commissioner not asked you that, and let you do what you wanted to do, told you it was up to you, what action would you have taken, if any?

MR. KENNEDY: Objection, it's hypothetical. You can answer the question. It would be speculation on his part.

THE WITNESS: I would have started the squirts.

BY MS. AFRICA:

Q. Do you remember saying that you believe the fire was of a relatively minor nature at that point?

A. Yes.

Q. Now, believing that, is it still, you know, your belief that you may not have been able to put the fire out by putting the squirts on it at that point?

MR. KENNEDY: Objection.

THE WITNESS: I could never have guaranteed the squirts to put out the fire, at any time.

*Id.* at 51–54. (Emphasis added).

For the reasons set forth in the above discussion, I consider the City defendants' objections to the factual, background descrip-

tions of this matter contained in my previous Report and Recommendation to be meritless. I shall not repeat those details now except as it may become necessary in order to comply with the mandate set by Judge Pollak's remand order.

When the initial effort to drill holes in the walls of the adjoining houses failed, resort was had to another scheme which provided for an explosive device which was to be used to dislodge a bunker from the roof of the MOVE residence so that tear gas could be infiltrated in the house. Another objective sought in removing the bunker was to eliminate it as a shield which protected the MOVE members who were believed to be shooting at the policemen and firemen. *See* Testimony of Officer Klein, July 10, 1991, Vol. I, Appendix to City Defendants' Motion for Summary Judgment at 217. Commissioner Sambor also testified before the MOVE Commission and accepted responsibility for this plan and described its objectives as follows:

> To assist your inquiry, let me make it clear that I approved the details of the plan to an extent where it can be fairly called my plan. I selected the date of the operation. I personally commanded the overall police operation. I determined that the bunker had to be removed. I decided that an explosive device should be used and that it should be dropped from a helicopter.
>
> I made each of these decisions because I thought they were proper and that they maximized protection of life.

Testimony of Defendant Sambor, October 17, 1985, Vol. I. Appendix to City Defendants' Motion for Summary Judgment at 107.

It appears from the record that defendants City Managing Director Brooks and Mayor Goode approved the plan developed by Sambor. As to Brooks, according to his testimony before the MOVE Commission, he was made aware of alternative plans for removing the bunker and making a hole in the roof all of which were discarded in favor of dropping an explosive device from a helicopter. His presence during the planning process and his active participation during the discussion relative to the plan ultimately devised leads to

the conclusion that he, in fact, did approve the plan. The following dialogue supports that conclusion.

By Mr. Lytton:

Q. Did there come a time during the afternoon where there was a discussion about an alternative to removing the bunker which did not include mechanical devices?

By Managing Director Brooks:

A. At one point *we* talked about inserting officers through the skylight next door and lobbing it over. *We* talked about—*we*—at this point this is where the subject of an explosion—

Q. That's what I was getting to.

A. Came in. Because *we* talked about some way to get, if you can't get on the roof, you have to get an explosion—explosive device on the roof that will penetrate the roof surface and may also dislodge the bunker because the significant amount of water had been heaved against those wooden structures and they have knocked off much of the plywood but they had not done very much to the actual structures themselves. They were all covered with plywood or tarpaulins.

Testimony of Defendant Brooks, Oct. 16, 1985 Vol I, Appendix to City Defendants' Motion for Summary Judgment at 87–88 (emphasis added). It also appears from the record that Brooks advised Mayor Goode of the plan to destroy the bunker which had been developed and that the plan was approved by the Mayor. According to Brooks, he kept the Mayor informed of the day's events by telephone. In his testimony before the MOVE Commission, he described his conversation with the Mayor at or about 5:00 o'clock on May 13.

By Mr. Lytton:

Q. And can you tell us exactly what you told the Mayor in that phone call?

By Managing Director Brooks:

A. I told the Mayor that we had come to the point of a crane not working, we could not insert anyone to the skylight, we could not—we could find no other way at this time to achieve this by dark, that it was going to be difficult to secure that area during the night. That the neighbors were clamoring to return to their homes, that there was—it would be very difficult even to light it up so that you could see in those alleys during the night, and that the commissioner wanted to drop a device on the roof to destroy the bunker and penetrate the roof.

Q. Did you tell the Mayor that it was going to be dropped from a helicopter?

A. I did.

\* \* \* \* \* \*

Q. Now, the Mayor testified as to May 13 that he, the Mayor, saw no reason to have to end the confrontation on May 13 and he was willing to go over to the next day and the next day.

Did you have a conversation with him about that?

A. I did.

Q. And did he suggest going into the next day or not?

A. I do not recall him suggesting that to me. He did not suggest that to me.

Q. And did you explain to him that you could not go into the next day that it had to end on May 13th.

A. No. I said these are the reasons to go ahead and attempt to conclude this today. I did not say that we cannot go till tomorrow. I said the information as the Commissioner has passed to me is that he cannot guarantee a good lighted alley throughout the night, that there is a possibility that people may come out of that house from, though a tunnel system or some other way that the neighbors are clamoring to get back in and the other things to which I already alluded.

*Id.* 93, 100–101. Although neither defendant Brooks nor defendant Goode appear to have been involved in the implementation of the plan, they, in my view, approved the plan and thus to that extent were responsible for the act of dropping the bomb.

Of those defendants who engaged in the execution of the plan, the extent to which defendants Klein and Powell did so has been described *supra* at 350–351. The remaining defendants who engaged in the execution of

the plan were defendant State Troopers Demsko and Reed. They, at the request of defendant Sambor, piloted the helicopter from which defendant Powell dropped the bomb onto the MOVE house. It appears clear from the record that defendants Demsko and Reed received their information regarding the resistance the police had met when attempting to serve the arrest warrants from defendants Sambor and Powell. Demsko Affidavit, November 16, 1988 at ¶ 13; Demsko Deposition at 28–30; Reed Deposition I at 29–31. Specifically, both defendants Demsko and Reed were aware that there had been gunfire exchanged between MOVE members and the police earlier on May 13, 1985. Demsko Deposition at 80–81; Reed Deposition I at 54. Moreover, defendant Reed was concerned that gunfire might come from the bunker on top of the MOVE house while he and defendant Demsko were piloting the helicopter into position so that defendant Powell could drop the bomb. Reed Deposition I at 44. Thus, he and defendant Demsko requested that the squirt guns be directed at the bunker and not shut off until they were atop the bunker and prepared to descend in order to drop the bomb. Demsko Deposition at 105; Reed Deposition I at 36, 40, 43–44. Finally, defendant Richmond did not participate in either the decision to drop the bomb or in the execution of that decision. Accordingly, the question of his liability will be discussed *infra* at 357.

In the motions for summary judgment, each defendant asserts, as grounds for relief, the defense of qualified immunity and the further defense that no constitutional viola-

tion has been shown by the plaintiff. For the reasons that follow, I conclude that defendants Goode, Brooks, Sambor, Powell, Klein, Demsko and Reed are entitled to qualified immunity insofar as the act of dropping the bomb on the MOVE house is concerned. I further conclude that all defendants, including defendant Richmond, are entitled to summary judgment because the plaintiff has not established, as a matter of law, that any defendant violated her constitutional rights with respect to the decision to drop the bomb or the act of dropping the bomb.

In his memorandum, Judge Pollak, citing *Tennessee v. Garner* 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985), concluded that on May 13, 1985

[T]he clear constitutional parameters for use of deadly force—whether incorporated into a substantive due process test or a Fourth Amendment reasonableness test— were the standards set forth in § 508[4] and given constitutional pedigree by the Supreme Court two months before the bomb was dropped on the MOVE residence.

Memorandum, Pollak, J. at 11–12. He ruled, therefore, that

in this case the relevant question for qualified immunity purposes is whether a reasonable person in each defendant's position could have believed that [the] use of a bomb and/or the decision to let the fire burn was necessary to "prevent death or serious bodily injury" to the police officers on the scene or other persons.

*Id.* at 12. (Footnote omitted).

Judge Pollak further ruled that:

himself or another from bodily harm while making the arrest. However, he is justified in using deadly force only when he believes that such force is necessary to prevent death or serious bodily injury to himself or such other person or when he believes both that:
(i) such force is necessary to prevent the arrest from being defeated by resistance or escape; and
(ii) the person to be arrested has committed or attempted a forcible felony or is attempting to escape and possesses a deadly weapon, or otherwise indicates that he will endanger life or inflict serious bodily injury without delay.
18 Pa.C.S.A. §§ 501, 508(a).

---

4. Section 501 of the Pennsylvania Crimes Code defines deadly force as "Force which under the circumstances in which it is used is readily capable of causing death or serious bodily injury.
 Section 508 of the Pennsylvania Crimes Code provides, in relevant part that:
 (a) Peace officer's use of force in making arrest—
 (1) A Peace officer, or any other person whom he had summoned or directed to assist him, need not retreat or desist from efforts to make a lawful arrest because of resistance or threatened resistance to the arrest. He is justified in the use of any force which he believes to be necessary to effect the arrest and of any force which he believes to be necessary to defend

Notwithstanding that defendants should have been aware of the governing legal principles embodied in § 508 and *Garner*, this does not end the qualified immunity inquiry. Defendants are 'nevertheless entitled to immunity if based on the information available to them, they could have believed their conduct would be consistent with these principles'. *Good*, 891 F.2d at 1092.[5]

*Id.* at 12–13.

As was described in my Report and Recommendation and by Judge Pollak in his memorandum, the defendants had information available to them that acts of violence would be inflicted by MOVE members upon their neighbors, defendant Goode, police officers and others if the police took action against them. Among the averments in the probable cause affidavit filed in support of the issuance of the warrants was this report, attributed to neighborhood residents, who described threats of violence made by MOVE members.

[O]n April 29, 1985 they heard MOVE members say over the loudspeaker that they have wired the entire block with explosives and that if any neighborhood resident speaks with the press, or the police take action against MOVE, MOVE will blow up the entire block.

Probable Cause Affidavit at 4. In addition, a neighborhood resident reported that:

On April 29, 1985 she heard MOVE members state over the loudspeaker that they wanted their people out of prison because they "didn't kill that policeman" (a reference to the murder of Officer James Ramp on August 8, 1978 by MOVE). The witness further stated that MOVE also said no one should talk to the police "or we will get you. We have guns too."

*Id.* at 5. It does not appear to be in dispute that, when the police attempted to execute the warrants, they were confronted with gunfire directed at them from the MOVE residence. As a result, the police were prevented from effecting the arrest of the plaintiff and the other MOVE members who were the subjects of the warrants. Thus, not only did the defendants have information available to them with respect to the threats of violence reported to have been made by the MOVE members, but the police and others on the scene actually encountered violent acts of deadly force by the gunfire directed at them from the MOVE residence.

Further, the police had assessed the feasibility of using alternatives to a bomb. The fire department had throughout the day used the squirt guns to direct many gallons of water at the bunker. This attempt to dislodge the bunker had failed. Testimony of Defendant Brooks, Oct. 16, 1985 Vol. I, Appendix to City Defendants' Motion for Summary Judgment at 88. The police had also thought that a crane might be used to knock the bunker off with a wrecking ball. Defendants Reed and Demsko had flown a police officer and a private contractor around the MOVE house earlier in the day and they had determined that a crane could not be used because, for its operator to have been out of the line and range of fire from the MOVE bunker, he would have to have been located too far away from the MOVE house to be effective. Reed Deposition I at 25–27; Demsko Deposition at 29; Testimony of Defendant Brooks, Oct. 16, 1985 Vol. I, Appendix to City Defendants' Motion for Summary Judgment at 79–80. The police had also decided against attempting to send its officers into the MOVE house through the adjoining building's skylight because that alternative would have exposed those officers to possible MOVE gunfire. Testimony of Defendant Brooks, Oct. 16, 1985 Vol. I, Appendix to City Defendants' Motion for Summary Judgment at 88, 90–91. The police also considered the feasibility of waiting another day before taking action to serve the warrants. That option was rejected, however, because the police did not believe that they could adequately light the alley behind the MOVE house so that it would be secure during the evening hours. *Id.* at 91D–91E. Upon considering each of these options, police officials decided not to pursue them because, they were not feasible or they would expose police

---

5. *Good v. Dauphin County Social Services,* 891 F.2d 1087 (3d Cir.1989).

officers and others death or serious bodily harm.

Accordingly, in view of the foregoing, I conclude that a reasonable person in each of the defendants' position could have believed that the use of an explosive device to remove the bunker from the roof and to provide access to the interior of the house for tear gas was necessary to "prevent death or serious bodily injury" to the police officers on the scene or other persons. In addition, based on the information available to them regarding MOVE's threats of violence and MOVE's use of force in resisting arrest, they could have believed that the use of the bomb would be conduct that was consistent with the principles embodied in § 508 and *Garner.*

There is no evidence in the record that defendant Richmond participated in the decision to drop the bomb. As explained *supra* at 353–355, that decision was made by defendant Sambor and approved by defendants Brooks and Goode. Because defendant Richmond did not participate in the decision or in the act of dropping the bomb, as a matter of law, he cannot be liable to the plaintiff for any constitutional injury that dropping the bomb might have caused. Accordingly, defendant Richmond should be granted summary judgment with respect to this part of the plaintiff's claim.

Moreover, I conclude, as a matter of law, that, based on all the circumstances surrounding the police department's attempt to serve the arrest warrants on the MOVE members which I have summarized *supra* at 356, the defendants' conduct was consistent with the principles embodied in § 508 and *Garner.* Accordingly, as a matter of law, the plaintiff has not demonstrated that any defendant violated her constitutional rights and summary judgment should be granted for all of the defendants.[6] The decision to let the fire burn, however, is an entirely different matter.

### B. Allowing the Fire to Burn.

After the bomb was dropped on the roof a fire ensued, the results of which Judge Pollak and I have previously described. Another facet of the plaintiff's excessive force claim rests, therefore, in her allegation that the defendants deliberately refused or failed to extinguish the fire even after it had destroyed the bunker and spread to the interior of the MOVE house. According to the plaintiff, the failure to put out the fire at that stage was a deliberately chosen means of exterminating the occupants of the MOVE residence.

Of the named defendants, the only ones who conceivably could have been involved in the failure to extinguish the fire were defendants Goode, Brooks, Sambor, and Richmond.

Mayor Goode has given deposition testimony that he had no participation in a decision to let any part of the MOVE house burn, and further, that when he learned the building was on fire, he gave orders that it be put out. Defendant Sambor supports the Mayor's testimony. In his pre-trial deposition, he testified as follows:

Q. Did you at any point instruct the fire commissioner or any fireman to start fighting the fire?

A. After I was informed by the managing director that the Mayor had told him regardless of what [I] wanted, to put the fire out. That was quarter after, 20 after 6:00 or so, somewhere in that area. Could even have been a couple minutes later or earlier; I don't know.

It was somewhere around that area that I got a call from the managing director that he had spoken to the Mayor and the Mayor didn't care what reason we had, but that he wanted the fire out.

At that time, there was a deputy commissioner from the fire department within

---

**6.** The plaintiff's suit against defendants Demsko and Reed in their official capacity as State Troopers is barred by *Will v. Michigan Dept. of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 2311, 105 L.Ed.2d 45 (1989). However, the plaintiff's suit against these defendants in their individual capacity is not barred by *Will* and it was proper for her to proceed upon it. *Hafer v.*

*Melo,* — U.S. —, —–—, 112 S.Ct. 358, 362–63, 116 L.Ed.2d 301 (1991). When sued in their individual capacity, these defendants may assert, as they have, "personal immunity defenses such as objectively reasonable reliance on existing law." *Hafer,* — U.S. at —, 112 S.Ct. at 362.

several feet. I went over and told him the managing director's order and he said he would relay it to the fire commissioner.

Q. Do you know if, in fact, he did?

A. I can't answer that question.

Q. Is it your understanding that the fire was fought from that point on?

A. No.

Sambor Deposition at 118–119.

Defendant Brooks gave an essentially similar account of his own role regarding the fire. At his deposition he testified as follows:

By Defendant Brooks:

A. ... I was just reminded that I didn't—or when I observed that there was a fire on that roof, I immediately attempted to find the police commissioner. Upon finding him, I ordered the police commissioner that the objective had been accomplished, put out the fire. Then the mayor called me after that. That's what I did do.

By Ms. Africa:

Q. You're saying, you ordered the police commissioner to put out the fire before you got a call from the mayor.

A. Yes. That's been testimony repeated over and over again. What I said to the mayor is I've already given the order.

Q. Do you know, at the point that you gave that order, to put the fire out, that the police commissioner—did you have any information at that point, as to why the fire wasn't being put out?

A. Well, not until I got in touch with the police commissioner, no, because I was a long ways away.

Q. At the point you got in touch with the police commissioner, did you receive any information as to why the fire was not being out?

A. I do not recall the words, but the effect was that I want to burn the bunker off some more.

MR. WAXMAN: When you say I, are you referring to yourself?

THE WITNESS: No, the police commissioner said I would like for the bunker to burn off some more, that was when I used the expression you've already accomplished your mission, put out the fire.

BY MS. AFRICA:

Q. So, at that point, you superseded the wishes of the police commissioner?

A. I gave him a direction to do that. If that is superseding, fine, if that's the word you want to use.

Q. You didn't feel like you had to contact the mayor before?

A. Well, I didn't have time. I saw fire.

Q. So, I take it that was something you considered a very, like, serious—

A. Very, very.

Brooks Deposition at 129–130.

Police Commissioner Sambor has testified that although he had urged the Fire Commissioner to allow the roof to burn, so that the bunker would be destroyed, that request was made by him only after being told by the Fire Commissioner that the fire could be controlled and prevented from spreading further. Sambor has also testified that the failure to extinguish the fire in the house itself was the responsibility of the fire-fighting officials on the scene, not the police. *See supra* at 351–352. Fire Commissioner Richmond has gone on record with three reasons for not putting out the fire: (1) that the Police Commissioner, Sambor, had asked him not to; (2) that smoke resulting from water on the flames would have impaired the vision of the police in a dangerous situation; and (3) that the firefighters could not have effectively fought the flames in the house without positioning themselves in a way that would have exposed them to possible gunfire from the MOVE house. Richmond Deposition, July 10, 1991 at 18.

The foregoing exculpatory explanations go to the factual responsibility of the defendants for allowing the fire, once started, to continue to burn to the interior of the MOVE house. These defenses thus go to the question of whether either Goode, Brooks, Sambor or Richmond violated, with respect to the fire, any constitutional right of Ms. Africa. Although that question is usually distinct and separate from the defense of qualified immunity, *Mitchell v. Forsyth,* 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985), it is important to keep in mind that each of the above defendants, in his motion for summary judg-

ment has put forth both grounds. That is, as discussed *supra* at 355–357, each of the motions for summary judgment asserts, as grounds for relief, the defense of qualified immunity and the further defense that no constitutional violation has been shown by the plaintiff. With regard to the plaintiff's claim concerning the fire and the failure to extinguish it, the issue of qualified immunity will be addressed first.

In their assertions of qualified immunity the defendants first rely on § 508, which authorizes peace officers to use deadly force when they believe that an arrestee presents a serious threat of death or serious bodily harm to the officers or others. With regard to the failure to extinguish the fire which had spread to the interior of the house, the claim of qualified immunity in terms of § 508 is tantamount to an assertion by the defendants that the occupants of the MOVE house continued to present a deadly danger to the police after the bunker was neutralized, which warranted the use of deadly force, and that such force could be in the form of allowing flames to force the occupants from the building. The defendants also point to the decision in *Ginter v. Stallcup,* 641 F.Supp. 939 (E.D.Ark.1986), *affirmed in part,* 869 F.2d 384 (8th Cir.1989), which involved the police use of fire as a means of forcing an armed and dangerous murderer from a house in June of 1983. The *Ginter* decision, both at the district court and Court of Appeals levels, held that such police action was entitled to the protection of qualified immunity under the standards of *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), because the plaintiff had not shown that the use of fire to flush an armed and dangerous fugitive from a residence violated any statutory or constitutional right which had been established as of the date of the occurrence, June 3, 1983.

According to the defendants in this case, the *Ginter* decisions provide at least some indication of the law as it existed as of June 1983, the date of the *Ginter* incident. They also argue that no legal development contrary to that holding had occurred up to the date of the May 13, 1985 MOVE events. Thus, according to the defendants, the state of the law on May 13, 1985, would not have caused the City of Philadelphia defendants to think that the law prohibited the deliberate use of fire to drive the MOVE resisters from their residence. The defendants also argue that under *Harlow v. Fitzgerald,* and the subsequent case of *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987), it is incumbent upon plaintiff Ramona Africa to demonstrate that the state of law at the time in question was such that no reasonable officer could have believed it lawful to use fire to force the surrender of MOVE. The defendants additionally argue that the plaintiff has not met that burden.

In assessing the validity of these arguments for qualified immunity, I begin with their contention that the Pennsylvania "deadly-force" statute, 18 Pa.C.S.A. § 508 would provide authorization for the use of fire under the circumstances existing at the MOVE residence on May 13, 1985 to drive the MOVE occupants from the building. As noted previously, the Pennsylvania statute authorizes the use of deadly force only when the peace officer believes that the subject poses a serious threat to life or safety of the officers or others. Another provision relating to that statute is § 501 which requires that the officer's belief of deadly or serious danger must be reasonable.[7] The question presented here is whether, after the fire had destroyed the roof-top bunker, there remained any reasonable basis for the police to believe that allowing the fire to burn was necessary to quell some perceived imminent peril. For the reasons that follow, I conclude there was not.

According to Police Commissioner Sambor, who was in command of the police field operations, the danger to his police officers was posed by the bunker. When the fire destroyed that structure, the principal source of perceived danger was eliminated[8]. If any

---

7. Section 501 of the Pennsylvania Crimes Code defines believes or belief as "reasonably believes or reasonable belief".

8. According to defendant Brooks, the bunker would have been neutralized even if it was not completely destroyed by the bomb. He testified to that effect as follows:

further risk was presented by the occupants of the MOVE house, which by that time had no roof, I find it difficult to imagine why allowing the fire to continue burning could be reasonably considered a necessary means of forcing a surrender. Therefore, it is my view that a decision to allow the fire to burn did not meet the requirement of reasonably-perceived necessity contained in 18 Pa.C.S.A. § 508.

As for *Ginter v. Stallcup,* I am not convinced that the facts of that case made it applicable here. In *Ginter,* a handful of police officers had to take immediate action against an armed murderer who, according to police testimony, was believed to have returned automatic-weapon gunfire just before the building was set afire. In the case at bar, the police presence surrounding the MOVE house on May 13, 1985, was on a massive and well-equipped scale. I cannot imagine how a decision to squirt water onto the flames would have made it more difficult to force the surrender of people in a building with no roof and probably full of smoke.

I conclude, therefore, that *had* the City of Philadelphia defendants deliberately allowed the MOVE house to continue burning as a means of forcing surrender, the circumstances under which such action was taken would not justify the protection of qualified immunity. Having reached that conclusion, I turn now to the other aspect of the defendants' summary judgment motions: whether the plaintiff has proved that the fire was the result of constitutionally violative behavior.

As noted, defendants Goode and Brooks have included in their motions for summary judgment, in addition to claims of immunity, assertions that the plaintiff has not proved any violations on their part of her constitutional rights. With regard to the plaintiff's allegations about the fire, defendants Goode and Brooks have testified that they had no participation in any decision to let the fire

burn. The plaintiff's response to the summary judgment motions contains no proof to rebut or contest the representations by Goode and Brooks. It must follow, then, that there is no genuine issue of fact as to the nonculpability of those defendants for the fire; and they are entitled to summary judgment regarding the plaintiff's claim concerning the fire. As to defendants Sambor and Richmond, the evidence of their participation regarding the fire is in a different posture. It is undisputed that each of them shared the decision to let the fire burn. Because that decision, in my view, was not justified by a peril to police officers or others, that decision amounts to unconstitutional excessive force subjecting defendants Sambor and Richmond to liability unless they can convince a factfinder of facts that warranted letting the fire burn. Accordingly, their motion for summary judgment must be denied.

As an additional dimension to her claim of excessive force, the plaintiff alleges in Paragraph 34 of her complaint as follows:

MOVE people, includin [sic] our babies, screamed repeatedly that we're bringin [sic] the children out but we continued to encounter gunfire which interfered with and/or prevented our escape from the burnin [sic] building and left my family burned or shot to death.

It is doubtful that this allegation is sufficient to state a cause of action against any of the defendants in this case. Nevertheless, giving the allegation a generous reading and interpretation, it can be taken as an assertion that unnamed members of the Philadelphia police used gunfire to force the plaintiff and other occupants of the MOVE house back into the burning building when they sought to leave and surrender, and further, that such tactic was part of an officially sanctioned plan of action against MOVE. If this allegation is true, such conduct would be, in my view, so maliciously sadistic and shocking to the con-

By Mr. Lytton:
Q. Now, if the bunker didn't fall off, but you had the hole in the roof, what were you going to do?
A. Well, the bunker would have been—by dropping that explosive on that roof, the bunker would have been pretty much neutralized even if it didn't knock it off [of the roof].

Appendix to City Defendants' Motion for Summary Judgment, Volume I at 94–95.

According to defendant Sambor by 6:20 p.m. the "bunker was consumed and fell into the second floor [of the MOVE house]". *Id.* at 141.

science of civilized people that no known standard of qualified immunity could insulate the perpetrators from suit or liability. Such a tactic would have as its sole purpose the death of or serious injury to the plaintiff, without giving her an option of avoiding that consequence by surrender. *See Brower v. Inyo County,* 489 U.S. 593, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989).

The plaintiff's additional problem in attempting to use the above allegation to establish a constitutional violation, either on a theory of unlawful force or due process, is the deficiency of her evidence in response to the summary judgment motions. The plaintiff has not presented any deposition, answer to interrogatories, affidavit or other acceptable evidence to demonstrate that if she was shot at by police officers to drive her back into the fire, such conduct resulted from the direction or acquiescence of any of the named defendants. For the plaintiff to tie such conduct to Mayor Goode, Leo Brooks, Gregore Sambor or William Richmond, there would have to be a showing that those officials directed or acquiesced in such a tactic. *See Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1975); *Black v. Stephens,* 662 F.2d 181, 195–96 (3d Cir.1981). Where on a motion for summary judgment by a defendant, it appears to the court that the plaintiff has not presented evidence to demonstrate that she can prove a necessary element of her claim, the defendant is entitled to summary judgment in his favor regarding that claim. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Therefore, to the extent that Ms. Africa's claim of constitutional violations rests on her allegation that unnamed policemen used gunfire to drive her back into the burning structure, her lack of documentary evidence as to the role of the defendants entitles those defendants to summary relief, not on the basis of qualified immunity but under the evidentiary principle of *Celotex.*

## II. *PLAINTIFF'S OTHER CIVIL RIGHTS CLAIMS*

As for the plaintiff's claim that the actions of the Philadelphia police in assaulting the MOVE house, and the actions of other governmental officials, deprived her of the freedoms of religion, speech, and association guaranteed by the First and Fourteenth Amendments of the Constitution, those claims must fail. The plaintiff has made no evidentiary showing, or basis for inferring, that the conduct of the governmental officials on May 13, 1985, had any purpose other than the implementation of lawfully issued arrest warrants and search warrants. Thus, all of the defendants are entitled to judgment as a matter of law on the plaintiff's First and Fourteenth Amendment claims.

Relying on another part of the Civil Rights Act of 1871, 42 U.S.C. § 1985(3), the plaintiff also seeks damages and other relief based on allegations that the actions of the police and other City defendants against her and other MOVE members in the May, 1985 confrontation were the result of a conspiracy between several officials of the City government, including the Mayor, Managing Director, Police Commissioner, and Fire Commissioner to deprive her of rights existing under the United States Constitution and other federal laws. In *Griffin v. Breckenridge,* 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971), the Supreme Court held that an action under 42 U.S.C. § 1985(3) requires the plaintiff to allege that there is some racial or otherwise class-based, invidiously discriminatory animus behind the acts of the alleged conspirators. 403 U.S. at 102, 91 S.Ct. at 1798. Ms. Africa's complaint presents no such allegation; nor has she offered any evidence to show that she could sustain her burden of proving the requisite animus. For those reasons, I must conclude that all of the defendants are entitled to summary judgment as to the plaintiff's action under § 1985(3).

## III. *THE LIABILITY OF DEFENDANT CITY OF PHILADELPHIA*

The City of Philadelphia, in moving for summary judgment, relies first on the rule set forth in *Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), restricting the liability of municipal corporations in actions brought under the federal Civil Rights Act of 1871. In the *Monell* case, the United States Su-

preme Court, while holding that municipal corporations and other local government units were amenable to suit under 42 U.S.C. § 1983, also held that traditional concepts of *respondeat superior* and vicarious liability did not apply. 436 U.S. at 691, 98 S.Ct. at 2036. That is, § 1983 liability cannot be imposed on a municipality solely because the wrongdoer had an employment relationship with it. *Id.* at 691, 694, 98 S.Ct. at 2036, 2037. Under *Monell,* a municipality or other local governing unit cannot be held liable under § 1983 unless the constitutional injury complained of was caused by some action pursuant to municipal custom or official policy. 436 U.S. at 690–91, 98 S.Ct. at 2036. As was later observed in *Oklahoma City v. Tuttle,* 471 U.S. 808, 821, 105 S.Ct. 2427, 2435, 85 L.Ed.2d 791 (1985), the *Monell* standard was intended to prevent the imposition of municipal liability "where no wrong could be ascribed to municipal decisionmakers."

In support of its motion, the City contends that plaintiff Ramona Africa has failed to show that the bombing of the MOVE house, the decision to let the fire burn, or any other act alleged by her in her suit, were part of any pre-existing municipal policy. According to the City, the plaintiff has not presented any evidence from which such a policy could even be inferred. The City asserts, moreover, that it had no official, operative policy or custom which could be said to contemplate the kind of confrontational events that took place between it and MOVE on May 13, 1985. Positing that the plaintiff's civil rights action against the City itself is based on unprecedented actions and decisions of its police and other officials, the City argues that those acts cannot be deemed to be the result of a pre-existing official policy, and thus, cannot be grounds for subjecting the City to liability for damages under that statutory provision. A flaw in the City's reasoning is that it ignores the Supreme Court's decision in *Pembaur v. City of Cincinnati,* 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986).

In *Pembaur,* the Supreme Court addressed the questions of whether, and under what circumstances, a single decision by a municipal officer to take a particular action on a single occasion can establish the kind of "official policy" required by *Monell* as a predicate to municipal liability under 42 U.S.C. § 1983. The Court answered the first question in the affirmative, holding "municipal liability may be imposed for a single decision by municipal *policymakers* under appropriate circumstances." *Pembaur,* 475 U.S. at 480, 106 S.Ct. at 1298 (emphasis added). In that regard, the Court further held that "where action is directed by those who establish governmental policy, the municipality is equally responsible whether the action is to be taken only once or to be taken repeatedly." *Id.* at 481, 106 S.Ct. at 1299.

*Pembaur* involved a § 1983 action against a city government and a county, with the plaintiff alleging that certain deputy sheriffs unlawfully and forcibly entered his business premises to effect an arrest. It was established that the deputies had acted upon the instructions of the county prosecutor; it was also established that the prosecutor was the *final* decisionmaker for the county with respect to such matters. The Supreme Court, applying the principles articulated, held that the act of the prosecutor in so instructing the deputies was sufficient to constitute "official policy" within the meaning of *Monell,* and thus subjected the county to liability under § 1983.

The United States Supreme Court has not always been of a single voice in identifying those municipal officers or employees whose decisions represent the official policy of the local government unit. However, cases subsequent to *Pembaur* reinforce its guiding proposition that actions by municipal officers with final policymaking authority may subject the government to § 1983 liability. *See, e.g., Jett v. Dallas Independent School District,* 491 U.S. 701, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989); *City of St. Louis v. Praprotnik,* 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988). Whether or not a particular local official has "final policymaking authority" is a question of state law. *Jett; City of St. Louis v. Praprotnik.* In resolving that question, the plaintiff bears the burden of proof. *E.g. Oklahoma City v. Tuttle, supra.*

Philadelphia's document of government, its Home Rule Charter,[9] provides *inter alia* that the Police Commissioner is the *head* of the Police Department, and that the Fire Commissioner is the *head* of the Fire Department. 351 Pa.Code § 3.3–102. As such, the Police Commissioner's function is to "exercise the powers and perform the duties vested in and imposed upon" the Police Department; the same is true of the Fire Commissioner in his relationship to the Fire Department. 351 Pa.Code § 3.3–102.

Under Philadelphia's Home Rule Charter, one of the functions or duties of the Police Department is to "preserve the public peace, prevent and detect crime . . . train, equip and supervise . . . the Philadelphia Police. 351 Pa.Code § 5.5–201. Given the broad powers and duties of the Police Commissioner under the Home Rule Charter, it is my conclusion that such official has final decisionmaking powers regarding the functions of that department.

The Home Rule Charter also provides that the Fire Department has the power and duty to "extinguish fires at any place," "administer and enforce statutes, ordinances and regulations relating to fire and explosion hazards," and "train, equip, supervise, and discipline" firemen. 351 Pa.Code § 5.5–400. Since the Fire Commissioner is, by City Charter, given the duty of seeing that those functions are carried out, I conclude that he is an official with final decisionmaking powers as to that department of City government. Accordingly, in my view, Police Commissioner Sambor and Fire Commissioner Richmond was each a municipal official with final decisionmaking powers.

Notwithstanding the foregoing discussion, the plaintiff's § 1983 action against the City is confronted with another obstacle. The City, as a municipal defendant, has no liability for acts of policymaking officials that do not amount to constitutional violations. *City of Los Angeles v. Heller*, 475 U.S. 796, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986); *see Owen v. City of Independence*, 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980). I have concluded that the decisions of the City of Philadelphia defendants to bomb the bunker did not constitute excessive force, and thus did not amount to a constitutional violation. Accordingly, there can be no basis for municipal liability regarding that decision. As to the decision to let the fire burn, my previous conclusion concerning the apparent lack of necessity for that decision or conduct leaves open a basis for holding that such action was constitutionally-violative excessive force. Since that conduct resulted from either the Police Commissioner or Fire Commissioner or both, the City would be subject to liability under *Monell* for that aspect of official behavior.

Here, the decision to let the MOVE house burn, resulting as it did from decisions by Commissioners Sambor and Richmond, must be deemed a policy decision within the meaning of *Pembaur*, and thus could subject the City itself to § 1983 liability. The decision to let the fire burn presents factual issues whose resolution could establish a constitutional violation for which the City would be liable. For that reason, the City's motion for summary judgment must be denied insofar as it relates to the plaintiff's allegations or claims concerning the decision to let the fire burn.

## IV. *THE PENDENT STATE LAW CLAIMS*

The plaintiff has also advanced pendent state claims against all of the defendants. Specifically, she claims that:

> The actions by the named defendants as described herein were extreme, outrageous, intentional and reckless. As a direct result of these actions, plaintiff suffered and continues to suffer from emotional trauma and physical injuries in the form of severe burns that are *permanent* scars, all of which is a direct result of the actions described herein. These actions are careless, negligent and/or constituted assault and battery and other unlawful conduct by defendants.

Complaint at ¶ 59 (emphasis as in original). Consideration of the defendants' motions for

---

**9.** The Philadelphia Home Rule Charter was enacted pursuant to the Home Rule Provision of the Pennsylvania Constitution, Article 9, § 2, and the enabling statute enacted thereunder.

summary judgment with respect to these claims follows.

### A. The City of Philadelphia Defendants

The plaintiff seeks an award of money damages against the City of Philadelphia Defendants. What each defendant did on May 13, 1985 has been extensively recounted by Judge Pollak and me and will not be repeated here. Each defendant has moved for summary judgment with respect to his alleged conduct. The standard that has been applied herein with respect to the defendants' motions for summary judgment on all of the plaintiff's constitutional injury claims will be applied here. That is, to be entitled to summary judgment each defendant must show that based on the undisputed material facts with respect to his conduct on May 13, 1985, he is entitled to judgment as a matter of law. Federal Rule of Civil Procedure 56(c).

The Political Subdivision Tort Claims Act (hereinafter "PSTCA"), 42 Pa.C.S.A. §§ 8541 et seq., grants immunity to employees of local government agencies to the same extent as their employing local agencies. 42 Pa.C.S.A. § 8545. Local government agencies are granted broad immunity under § 8541. There are only eight exceptions to the broad grant of immunity. The exceptions cover the following activities: (1) vehicle liability, (2) care, custody or control of personal property, (3) real property, (4) trees, traffic controls and street lighting, (5) utility service facilities, (6) streets, (7) sidewalks, (8) care, custody or control of animals. 42 Pa.C.S.A. § 8542(b)(1)–(8). Since the events that occurred on May 13, 1985 do not involve any of the eight exceptions, all City defendants would seem to qualify for immunity under § 8545.

However, 42 Pa.C.S.A. § 8550 provides another exception to the immunity granted local officials under § 8545. Section 8550 provides that if "it is judicially determined that the act of the employee caused the injury and that such act constituted a crime, actual fraud, actual malice or willful misconduct, the

provisions of section[ ] 8545 … shall not apply." 42 Pa.C.S.A. § 8550. In order to be entitled to summary judgment, each City defendant would have to show, as a matter of law, that his conduct on May 13, 1985, did not constitute a crime, actual fraud, actual malice or willful misconduct. Inasmuch as defendants Richmond and Sambor's motions for summary judgment should be denied on the plaintiff's § 1983 claims for their decision to let the fire burn, they cannot show as a matter of law that their decision did not constitute willful misconduct. Accordingly, they are not entitled to summary judgment with respect to the plaintiff's pendent state claims based on the provisions of the PSTCA. All other City defendants [10] have been granted summary judgment on all of the plaintiff's claims for their conduct on May 13, 1985. Thus, they have demonstrated, as a matter of law, that their conduct did not constitute a crime, actual fraud, actual malice or willful misconduct. Accordingly, they are entitled to immunity under the PSTCA and they should be granted summary judgment with respect to the plaintiff's pendent state claims.

### B. The City of Philadelphia

Under the PSTCA, the City of Philadelphia is granted broad immunity. 42 Pa. C.S.A. § 8541. Section 8542 provides exceptions to the broad grant of immunity which permit the City to be liable for certain acts of its employees. Section 8542(a)(2) provides that the City can only be liable for negligent acts of its employees. Specifically, the City cannot be held liable for any acts by its employees which constitute a crime, actual fraud, actual malice or willful misconduct. § 8542(a)(2). Further, the City can only be liable for the negligent acts of its employees which fall into at least one of the following eight categories: (1) vehicle liability, (2) care, custody or control of personal property, (3) real property, (4) trees, traffic controls and street lighting, (5) utility service facilities, (6) streets, (7) sidewalks, (8) care, custody or control of animals. 42 Pa.C.S.A. § 8542(b)(1)–(8).

---

10. For the sake of clarity, all other City defendants include defendants Goode, Brooks, Klein, Powell, Connor, Revel and Tursi.

The City cannot be liable for the conduct of any of the City defendants because none of the defendants' conduct involved any of the activities listed in § 8542(b)(1)–(8). Further, the decision by defendants Sambor and Richmond to let the fire burn constituted willful misconduct. Therefore, pursuant to § 8542(a)(2), the City would not be liable for their decision to let the fire burn for this reason as well.

Although the City is entitled to immunity under the PSTCA, the question remains as to the effect of now repealed Chapter 21–700 of the Philadelphia Code. It provided that "the City shall not plead governmental immunity as a defense in any civil action commenced by any person sustaining bodily injury or death caused by negligence or unlawful conduct of any police officer while the latter is acting within the scope of his office or employment." Philadelphia Code § 21–701(a). Obviously this provision would only apply to the conduct of defendants Sambor, Klein, Powell, Connor, Revel and Tursi since they are the only City defendants who were police officers on May 13, 1985.

On December 4, 1990, the Mayor signed into law Bill No. 1057 which repealed Chapter 21–700, including § 21–701. Section 2 of Bill No. 1057 provided that the ordinance would take effect immediately and that it would apply to all pending civil actions and to all civil actions commenced on or after the effective date of the ordinance. The City asserts that this retroactive repeal applies to the plaintiff's case since it was pending at the time Bill No. 1057 was signed by the Mayor. Memorandum of Law in Support of City Defendants' Motion for Summary Judgment (Document No. 638) at 39–43. If the City is correct, the City may successfully plead immunity as to the acts committed by defendants Sambor, Klein, Powell, Connor, Revel and Tursi on May 13, 1985.

However, the City's argument must fail. In *City of Philadelphia v. Patton*, 148 Pa. Commw. 141, 609 A.2d 903 (1992), the Commonwealth Court of Pennsylvania addressed that claim and held that the retroactive application of Bill No. 1057 to actions which had accrued prior to its enactment and were pending at the time of its enactment violated due process.[11] *Id.* at 906. In *Strauss v. Springer*, 817 F.Supp. 1203 (E.D.Pa.1992), the court addressed the same issue and it also concluded that the Bill No. 1057 could not be applied retroactively to an already accrued cause of action. *Id.* at 1210. *Strauss* was decided on May 18, 1992, one day before the Commonwealth Court decided *Patton*. Thus, in *Strauss*, the court did not have the benefit of the Commonwealth Court's decision in *Patton*. Nonetheless, the court in *Strauss* came to the same conclusion as that of the court in *Patton*.[12]

Since this court and the Commonwealth Court of Pennsylvania have recently held that the retroactive application of Bill No. 1057 to an already accrued cause of action would violate due process, the only question which remains is whether the plaintiff's cause of action had accrued at the time the repealer ordinance was enacted. "In Pennsylvania, a tort cause of action generally accrues on the date of the accident or injury." *Patton*, 609 A.2d at 905 (citing *Gibson v. Commonwealth*, 490 Pa. 156, 415 A.2d 80 (1980)). Applying this rule, the plaintiff's cause of action accrued on May 13, 1985, the date of

---

11. In so holding, the court noted that the City had erroneously relied upon *McHugh v. Litvin, Blumberg, Matusow & Young*, 525 Pa. 1, 574 A.2d 1040 (1990). *City of Philadelphia v. Patton*, 148 Pa.Commw. 141, 609 A.2d 903, 905 (1992). Here, the City's Memorandum of Law also suffers from the same erroneous reliance upon *McHugh* which · the Commonwealth court discussed in *Patton*. *Compare* Memorandum of Law in Support of City Defendants' Motion for Summary Judgment (Document No. 638) at 41–42 *with Patton*, 609 A.2d at 905.

12. In *Strauss*, the court did not explicitly hold that retroactive application of the repealer ordi-

nance would violate due process. However, that argument had been presented to the *Strauss* court, *Strauss*, 817 F.Supp. at 1209, and the court applied *Gibson v. Commonwealth*, 490 Pa. 156, 415 A.2d 80 (1980) as the controlling law in Pennsylvania in resolving that issue. *Strauss*, 817 F.Supp. at 1209. In *Patton*, the Commonwealth Court also cited *Gibson* as the controlling case when it held that the retroactive application of the repealer ordinance violated due process. *Patton*, 609 A.2d at 905–06. Thus, *Strauss* is properly viewed as holding that the retroactive application of the repealer ordinance would violate due process.

the conflagration at the MOVE house. Since her cause of action had accrued and was pending at the time that Bill No. 1057 was enacted, Bill No. 1057 cannot be applied retroactively to her cause of action. Accordingly, pursuant to Philadelphia Code § 21–701(a), the City may not plead its immunity under the PSTCA with respect to the acts taken by defendants Sambor, Powell, Klein, Tursi, Revel and Connor on May 13, 1985.

### C. The State Defendants [13]

Title 1, Section 2310 of the Pennsylvania Consolidated Statutes provides that "the Commonwealth, and its officials and employees acting within the scope of their duties, shall continue to enjoin sovereign and official immunity from suit except as the General Assembly shall specifically waive the immunity." *Id.* The Commonwealth has enacted 42 Pa.C.S.A. § 8522, which is a limited waiver of sovereign immunity. Section 8522 waives sovereign immunity for only nine types of activities: (1) vehicle liability, (2) medical-professional liability, (3) care, custody or control of personal property, (4) Commonwealth real estate, highways or sidewalks, (5) potholes and other dangerous conditions, (6) care, custody or control of animals, (7) liquor store sales, (8) National Guard activities, (9) toxoids and vaccines. 42 Pa.C.S.A. § 8522(b)(1)–(9).

Here, the state defendants' activities on May 13, 1985 did not fall within any one of the nine activities listed in 42 Pa.C.S.A. § 8522(b)(1)–(9). Since none of the exceptions to immunity apply in this case, defendants Reed and Demsko are entitled to the immunity granted them by 1 Pa.C.S.A. § 2310. Because defendants Reed and Demsko have demonstrated, as a matter of law, that they are entitled to immunity under 1 Pa.C.S.A. § 2310 for their activities on May 13, 1985, they should be granted summary judgment with respect to the plaintiff's pendent state law claims.

### V. *THE SUMMARY JUDGMENT MOTIONS OF DEFENDANTS TURSI, REVEL AND CONNOR*

As noted, *supra* at 347, the motions for summary judgment filed by defendants Tursi, Revel and Connor on qualified immunity grounds were granted by Judge Pollak on August 18, 1992. The rationale for that action was that these defendants had only been involved in the initial plan to drill holes for the insertion of tear gas from walls adjoining the MOVE residence. Judge Pollak agreed with my view that the defendants were entitled to qualified immunity because their actions involved a reasonable use of force in making the arrests and, hence, were objectively reasonable. *See* Memorandum, Pollak J. at 5 n. 5. As I read the defendants' motion, they claim entitlement to judgment as a matter of law on all of the plaintiff's claims upon her failure to demonstrate that any of them had violated any of her constitutional rights or her rights under state law.

There is no evidence in the record that they participated in the planning or the dropping of the bomb or the decision to let the fire burn. Thus, they are entitled to summary judgment on the plaintiff's Fourth Amendment claim of excessive force. Further, they are entitled to judgment on the plaintiff's First Amendment claim and § 1985(3) claim for the reasons set out *supra* at 361. Finally, they are entitled to summary judgment on the plaintiff's pendent state claims on the grounds set forth *supra* at 363–364.

### RECOMMENDATION

AND NOW, this 6th day of October, 1993, it is RECOMMENDED that the following motions for summary judgment be GRANTED in part and DENIED in part:

1. The motions of defendants Reed and Demsko for summary judgment (Documents No. 450, 608) on qualified immunity grounds and with respect to liability on all of the plaintiff's substantive federal and state claims should be GRANTED;

2. The motions of defendants Revel, Tursi and Connor for summary judgment (Document Nos. 634, 637, 645, 733) on all of the plaintiff's substantive federal and state claims should be GRANTED;

---

**13.** The state defendants are State Troopers Reed and Demsko.

3. The motions of defendants Powell and Klein for summary judgment (Document Nos. 635, 673) on qualified immunity grounds and with respect to liability on all of the plaintiff's substantive federal and state claims should be GRANTED;

4. The motions of defendants Goode and Brooks for summary judgment (Document Nos. 643, 641) on qualified immunity grounds and with respect to liability on all of the plaintiff's substantive federal and state claims should be GRANTED;

5. The motions of defendants Sambor and Richmond for summary judgment (Document Nos. 636, 642, 653) on qualified immunity grounds and with respect to liability on plaintiff's First and Fourteenth Amendment grounds as well as her claims under 42 U.S.C. § 1985(3) should be GRANTED;

6. The motions of defendants Sambor and Richmond for summary judgment (Document Nos. 636, 642, 653) on qualified immunity grounds and with respect to liability on plaintiff's substantive federal and state claims based on their alleged dropping of the bomb on the MOVE residence should be GRANTED;

7. The motions of defendants Sambor and Richmond for summary judgment (Document Nos. 636, 642, 653) on qualified immunity grounds and with respect to liability on plaintiff's substantive federal and state claims based on their alleged action in "letting the fire burn" should be DENIED;

8. The motion of defendant City of Philadelphia for summary judgment (Document No. 638) with respect to liability on plaintiff's substantive federal claims based on the alleged dropping of the bomb on the MOVE residence should be GRANTED;

9. The motion of defendant City of Philadelphia for summary judgment (Document No. 638) with respect to liability on plaintiff's substantive federal claims based on defendants Sambor and Richmond's alleged action in "letting the fire burn" should be DENIED;

10. The motion of defendant City of Philadelphia for summary judgment (Document No. 638) with respect to liability on plaintiff's First and Fourteenth Amendment grounds

as well as her claims under 42 U.S.C. § 1985(3) should be GRANTED;

11. The motion of defendant City of Philadelphia for summary judgment (Document No. 638) with respect to liability on the plaintiff's pendent state claims arising out of the actions of defendants Goode, Brooks and Richmond is GRANTED;

12. The motion of defendant City of Philadelphia for summary judgment (Document No. 638) with respect to liability on the plaintiff's pendent state claims arising out of the actions of defendants Sambor, Klein, Powell, Tursi, Revel and Connor is DENIED.